The STATE of Ohio, Appellee,

v.

ROUGHTON, Appellant.

[Cite as *State v. Roughton* (1999), 132 Ohio App.3d 268.]

Court of Appeals of Ohio,
Sixth District, Wood County.

No. WD–97–038.

Decided Feb. 12, 1999.

270

*Alan R. Mayberry,* Wood County Prosecuting Attorney, for appellee.

*Daniel Grna,* for appellant.

HANDWORK, Presiding Judge.

This is an appeal from a May 8, 1997 judgment entry of the Wood County Court of Common Pleas in which the court accepted guilty verdicts from a jury and sentenced appellant for two counts of rape, one count of felonious sexual penetration and one count of aggravated burglary. Appellant presents seven assignments of error for consideration:

"I. Appellant's retrial was barred by the Double Jeopardy Clause of the Fifth Amendment.

"II. Appellant's retrial was barred on speedy trial grounds.

"III. Appellant was denied his right to a fair trial by the prosecutor's continual and flagrant violations of the discovery rules.

"IV. Appellant was denied his right to a fair trial by the prosecutor's deliberate violation of the trial court's order not to refer to the alleged 'killing' statement.

"V. Under the circumstances of the case, it was prejudicial error to give an instruction on inferences which did not include a requirement that any facts necessary to support the inference must be proven beyond a reasonable doubt.

"VI. As a minimum, the failure to provide appellant with the information that DNA slides with nucleated material were available requires that appellant be granted a new trial so that appellant may have his experts test for exculpatory material.

"VII. The cumulative effect of the prosecutor's continuous, flagrant, and deliberate misconduct warrants reversal of his conviction."

To place the arguments presented in support of and opposition to these assignments of error in context, we begin by reviewing some of the facts and procedure in this case.

Sometime in the late evening hours of June 9, 1996 or the early morning hours of June 10, 1996, an elderly woman living alone in a trailer was awakened in her bed when a man's gloved hand grabbed her arm. She was immediately thrown from the bed to the floor, with a sheet wrapped around her head. The man proceeded to rape her repeatedly for a span of time that seemed to her to last more than an hour. Her attacker forced her to perform oral sex on him, performed oral sex on her, and finished the attack by repeatedly ramming an object into her rectum.

After her attacker left, she was eventually able to call a son on the telephone to say she needed help. His wife called 911 for help while he drove to his mother's home. Police and emergency medical personnel arrived, and the elderly woman

was taken to the hospital. She had to have surgery to repair tears in her vagina and in her rectum.

Before she was taken to surgery, she was interviewed by two detectives from the Northwood Police Department. She told them her attacker had demanded money. Because she only had $18 in cash and her social security check was directly deposited into her bank account, the attacker told her to get $500 in cash and to put it in her mailbox before she went to bed the next night. She said she never saw her attacker's face, but he had a stocky build, smelled of tobacco, and spoke with a drawl. He said things to her that led her to believe he knew her family: he knew she was separated from her husband and he mentioned the name of one of her six children.

The son she called for help overheard the description, and told the detectives it sounded like appellant. He suggested that they might want to consider appellant as a suspect.

The detectives went to the elderly lady's trailer and put an envelope stuffed with paper in her mailbox. They staked out the trailer. Sometime after eleven o'clock at night, the detectives saw a large white car drive by the trailer twice. The second time past, the car stopped for a few seconds, on the wrong side of the road, and a door on the driver's side of the car was opened and closed. The detectives checked after the car left, and the envelope was gone from the mailbox. The detectives could see the color and make of the car and clearly saw five of six numbers on the rear license plate of the car.

Appellant was roused from his bed a few hours later by police officers from the Toledo Police Department and an officer from the Northwood Police Department. He was taken in for questioning at the Northwood Police Department. He waived his *Miranda* rights and talked with one of the detectives. The conversation was tape-recorded.

Appellant denied any involvement with the crimes under investigation. Nevertheless, appellant was indicted for the crimes by the grand jury sitting in Wood County, Ohio on August 21, 1996. The indictment contained the charges relating to the four convictions appellant now challenges on appeal and also contained a charge that appellant committed extortion, a violation of R.C. 2905.11.

Appellant pleaded not guilty to all the charges. His counsel made a request for full discovery. Before the case proceeded to trial, appellant filed a motion to compel. He complained that the state had not provided him with summaries of witness statements and had not provided him the results of scientific tests. The motion to compel was resolved by an agreement and stipulation of the parties, entered into in the presence of the trial judge, that the state would provide the defendant with summaries of the anticipated testimony of the witnesses it

intended to call in the case. In addition, the state provided appellant with the results of the scientific tests.

The case proceeded to jury trial on December 16, 1996. A jury was selected and sworn in. Opening statements were made by counsel for the state and for appellant, and witnesses called by the state began giving testimony. On the second day of trial, the state informed appellant and the court that it had a potential new witness it had just discovered. The trial court ordered that the new witness be made available to meet with appellant's counsel at least one-half day before the witness was called by the state. The trial court then directed that the trial continue.

One witness subsequently called by the state was the detective who interviewed appellant when he was brought in for questioning. Prior to trial, the state gave appellant's counsel a summary of the statements appellant made to the detective. The summary showed appellant denied being in the trailer park where the elderly lady lived on the evening when the envelope with cut paper inside was removed from her mailbox.

However, the detective who interviewed appellant revealed in his testimony at trial that appellant later changed his story and admitted that he was in the trailer park that night to visit some former neighbors. Appellant's counsel immediately objected, arguing that he was misled by an incomplete summary of the witness's testimony. He asked for a mistrial.

The trial court allowed appellant's counsel to voir dire the detective out of the presence of the jury. The detective confirmed the summary provided to appellant's counsel was not complete. He said that he told the prosecutor, Alan Mayberry, the day before during a lunch break that the summary did not have all of the information from his interview with appellant. He said the prosecutor did not respond in any way. Mayberry told the court that it was very hectic in his office during the lunch break and that he did not recall hearing the detective tell him there was information missing from the summary.

The trial court denied appellant's motion for mistrial but dismissed the extortion charge after ruling that the state failed to provide full disclosure of the statements appellant made to the detective. The trial court also ordered the exclusion of any more evidence or testimony "regarding the Defendant's whereabouts on the night of June 10, 1996, including any cross examination of Defendant, or regarding any statements made by Defendant to the Police not included in [the summary of the interview of appellant by the detective]."

As the trial continued, the state called a forensic scientist who worked for the Bureau of Criminal Investigation and Identification ("BCII"). He tested a stain he found on the fitted bed sheet that was taken from the victim's bed by the

Northwood police detectives. He testified at trial that he did two presumptive tests of the stain for semen and two confirmatory tests for semen. The two presumptive tests were positive, but the two confirmatory tests were negative. He testified that even though his written report showed that there were indications of the presence of semen in the stain, he could not testify to a reasonable degree of scientific certainty that the stain was semen. He also agreed that he could state with certainty only that the stain was biological, but he could not say whether it was semen, saliva, urine, or some other bodily fluid.

Appellant again made a motion to dismiss based upon the state's failure to make full disclosure. He showed the trial court the written report he had received from the state regarding the scientific test results. He argued that the witness's testimony differed from the written report he was given. He said, "I was never told that there was a negative conclusionary [*sic*] test."

The state argued that appellant's counsel had not carefully read the written report that was provided. Mayberry said:

"You'll notice on his report there he doesn't list out the presumptive tests. He doesn't list out each of the conclusionary tests. He doesn't list out his visual observations. And again, this is perhaps beating a dead horse, but he does not say it's positive. He cannot say it's negative. He cannot say either one. He can say all those things indicate the presence of semen except the two confirmatory tests which did not. And therefore, because of this the standard that they operate under he cannot positively to a reasonable degree of medical certainty say it is positive for semen, and he didn't say it was positive for semen and in that report indication is the presence."

Both appellant and the state objected to a continuance so that appellant could hire a DNA expert, arguing that they would be prejudiced by the delay. Furthermore, appellant argued that he was so prejudiced by the new revelation that he could not get a fair trial if it proceeded, even if the court excluded all testimony about DNA. Appellant argued that he was entitled to a dismissal of all charges, or, at the very least, a mistrial.

The trial court found that the state was aware of the anticipated testimony of the witness that was at issue. The trial court ruled that the state had failed to comply with the requirements of Crim.R. 16. The trial court found that there was a "cumulative nature of the State's failure of disclosure" and ordered a mistrial. The state subsequently retried appellant resulting in the conviction he now appeals.

Appellant now argues in support of his first assignment of error that he should never have been tried again following the mistrial. He argues that the second

trial was a violation of the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution.  He presents three arguments to support his contention.

First appellant says that the trial court should have excluded all testimony about DNA and permitted his trial to proceed, rather than grant a mistrial when the BCII official testified at variance with his written report.  He says that the state should have been forced to proceed with a greatly weakened case, and argues that when the trial court declared a mistrial, it forced him to bear the burden for misconduct of the state.

The state argues that it did not commit any prosecutorial misconduct.  The state says appellant was confused by the written report and testimony of the witness from BCII "and now claims that his confusion and inability to understand the evidence was the result of intentional prosecutorial misconduct."

The record contains the written report from the BCII expert that was provided to appellant before trial.  The relevant portion of the report reads as follows:
"FINDINGS:

| "ITEM NO. AND DESCRIPTION: | SEMEN: | HUMAN BLOOD: |
| --- | --- | --- |
| "1.  Swab from living room carpet . . . . . . | negative | negative |
| "A1.  Vaginal rape kit . . . . . . . . . . . . . . . . . . | negative | positive |
| "A1.  Rectal rape kit . . . . . . . . . . . . . . . . . . | negative | positive |
| "A1.  Oral rape kit . . . . . . . . . . . . . . . . . . . . | negative | negative |
| "A1.  Washcloth . . . . . . . . . . . . . . . . . . . . . . | negative | positive |
| "A2.  Pillowcase . . . . . . . . . . . . . . . . . . . . . . | negative | positive |
| "A2.  Bedsheet . . . . . . . . . . . . . . . . . . . . . . | see below | positive |
| "A3.  Gauze pad . . . . . . . . . . . . . . . . . . . . . . | negative | negative |

"Examination of the bedsheet indicated the presence of semen."

◼ We agree with appellant and with the trial court that a reasonable interpretation of the written report would be that the presence of semen was established to a reasonable degree of scientific certainty.  The record shows that Mayberry was fully aware before trial that the presence of semen was not established to a reasonable degree of certainty.  We agree with the trial court that the failure to fully explain the test results to appellant prior to trial was egregious and was a violation of Crim.R. 16.

◼ We do not agree, however, with appellant's assertion that the only reasonable remedy for the trial court was to order the exclusion of all DNA evidence and to keep the trial proceeding.  The trial court clearly said it based its decision to grant a mistrial on the cumulative nature of the state's failure to make full disclosure for discovery.  As we have already noted, the state had previously failed to provide complete summaries of witness statements and had disclosed the identity of a potential new witness on the second day of trial.  The trial court

could reasonably conclude, after learning that yet another piece of important evidence was not timely disclosed to appellant, that the best remedy to ensure that appellant received a fair trial was to declare a mistrial to grant him time to prepare his defense based upon all of the information available. We therefore find that the trial court did not violate appellant's due process rights when it granted him a mistrial.

Second, appellant argues that the state was barred from putting him on trial for a second time because it goaded him into asking for a mistrial during the first trial. The Supreme Court of Ohio has said:

"The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy* (1982), 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 422. When a trial court grants a criminal defendant's request for a mistrial, the Double Jeopardy Clause does not bar a retrial. *Id.* at 673, 102 S.Ct. at 2088, 72 L.Ed.2d at 423. A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial. *Id.* at 678–679, 102 S.Ct. at 2091, 72 L.Ed.2d at 427. See, also, *State v. Doherty* (1984), 20 Ohio App.3d 275, 20 OBR 338, 485 N.E.2d 783. Only where the prosecutorial conduct in question is intended to 'goad' the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion. *Oregon v. Kennedy, supra,* 456 U.S. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 425." *State v. Loza* (1994), 71 Ohio St.3d 61, 70, 641 N.E.2d 1082, 1097.

The state argues that even if some prosecutorial misconduct can be found in this case, it was not severe enough to goad appellant into asking for a mistrial. The state points out that it vigorously opposed the request for a mistrial, evidence, it says, that it did not have any intent to goad appellant into seeking a mistrial. The state contends, therefore, that appellant was not placed in double jeopardy when he was retried.

We have carefully reviewed the record and agree with the trial court that there is insufficient evidence to conclude that Mayberry acted with an intent to "goad" appellant into asking for a mistrial. While we find the repeated failure to make full, timely disclosure of evidence deplorable, we cannot conclude that the purpose behind the behavior was a desire to force a mistrial. Mayberry's explanation as to his behavior in each instance was (1) he did not learn of the new potential witness until the second day of trial, (2) he did not hear the detective tell him that the summary of appellant's statements to the detective was incomplete, and (3) he honestly believed that appellant should have called the

witness from BCII to inquire further about how he reached the conclusion that the tests showed the presence of semen.

While we, like the trial court, are unpersuaded by each of the arguments presented by Mayberry, we do not conclude that he had an ulterior purpose of forcing a mistrial. We do conclude that he showed a woeful lack of comprehension of the purpose behind the discovery rules in this state: to provide full disclosure of evidence to the accused before trial so that due process is served. The trial court made appropriate orders in each instance to ensure that appellant's right to a fair trial was preserved.

Third, and finally, appellant argues that this court should declare that the Ohio Constitution gives greater double jeopardy protection than the federal Constitution. Appellant says that this court should rule that under the Ohio Constitution, the standard for triggering double jeopardy protection following a mistrial is prosecutorial recklessness, rather than prosecutorial intent to goad an accused into asking for a mistrial.

The Eighth District Court of Appeals considered a similar argument, and said:

"While the states are free to interpret their own constitutions to afford greater protection than that provided by the United States Constitution, the Ohio Supreme Court has recently stated that 'Ohio courts have historically treated the protections afforded by the Double Jeopardy Clauses of the Ohio Constitution and the United States Constitution as coextensive.' *State v. Gustafson* (1996), 76 Ohio St.3d 425, 432, 668 N.E.2d 435, 441. Given existing precedent from the Supreme Court, we find no reason to expand the constitutional protection afforded under the Ohio Constitution." *State v. Girts* (1997), 121 Ohio App.3d 539, 550, 700 N.E.2d 395, 402.

We agree with the reasoning of the *Girts* court and decline to rule that the Ohio Constitution gives greater double jeopardy protection than the federal Constitution. Accordingly, appellant's first assignment of error is not well taken.

In support of his second assignment of error, appellant argues that his retrial was barred due to a violation of his right to a speedy trial. He argues that the delay between his mistrial and his retrial was unreasonable. He says, "In effect, the State, by its prosecutor's misconduct, dragged the trial of Appellant's case out for approximately three months, with only a handful of those days devoted to testimony, and the rest of it devoted to trying to clean up the mess created by the State."

As the Eighth District Court of Appeals has noted:

"The speedy trial provisions of R.C. 2945.71 do not apply to retrials. *State v. Fanning* (1982), 1 Ohio St.3d 19, 21 [1 OBR 57, 58–59], 437 N.E.2d 583

[585]. Instead, we consider the reasonableness of the length of time it takes to convene a retrial. *Id.; State v. Fields* (1991), 75 Ohio App.3d 123, 127, 598 N.E.2d 1264 [1266–1267]. Relevant factors are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial rights; and (4) the prejudice to defendant. See *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 [116–117]. When considering the issue of delay, the speedy trial statute, while not controlling for retrial purposes, may nonetheless assist us in determining what is reasonable under the circumstances. *Fanning,* 1 Ohio St.3d at 21 [1 OBR at 58–59], 437 N.E.2d at 585." *State v. Girts* (1997), 121 Ohio App.3d 539, 553–554, 700 N.E.2d 395, 405.

Applying these standards in this case, we conclude that appellant's right to a speedy trial was not violated.

During the month of January 1997, appellant filed a series of motions following his mistrial. He raised several difficult issues for the trial court to consider. The trial court ruled on each of the motions by February 10, 1997. In addition, the trial court continued the trial until March 11–14, 1997 because of an unanticipated medical incapacitation of the prosecuting attorney. Our review of the record shows, therefore, that appellant's retrial was not unreasonably delayed. Furthermore, we find no evidence that appellant was prejudiced by the delay that did occur. Accordingly, appellant's second assignment of error is not well taken.

In support of his third assignment of error, appellant argues that he was denied his right to a fair trial by the prosecutor's continuous and flagrant violations of the discovery rules. He points out that violations happened during both his original trial and his retrial.

Appellant makes some reference to violations regarding the disclosure of information regarding DNA evidence. However, he acknowledges that his arguments concerning this issue are really presented under appellant's sixth assignment of error and that he mentions it in relation to the third assignment of error only to "demonstrate the lengths to which the prosecution went, in the instant case, to deny discovery to the Appellant in order to assure a prosecution victory in a very weak case." Accordingly, we will not discuss the DNA evidence in relation to this assignment of error, but will consider it when we discuss the sixth assignment of error.

In the remainder of his argument in support of his third assignment of error, appellant focuses on the state's failure to tell him that a fingerprint search was done at the victim's trailer, but no fingerprints were found. He first learned that a fruitless search was done through testimony of a witness at the second trial. He asked for a mistrial, which the trial court denied. The trial court said

that the information that the investigators failed to find fingerprints was not potentially exculpatory and did not need to be disclosed to appellant.

Appellant now argues that "the main defense theory was that the authorities had simply 'rushed to judgment.' Their failure to be able to find a single print would have supported that theory." He says that because this failure to disclose was one in a series of failures, it was prejudicial to him.

We agree with the reasoning of the trial court. The investigators' failure to find any fingerprints at the scene of the crime does not in any way lead to a conclusion that appellant could not be responsible for the crimes that were committed. Therefore, because the information was not potentially exculpatory, the state did not have an obligation to disclose it to appellant.

Appellant was not deprived of his right to due process by the trial court's ruling on the discovery issue in question. Appellant's third assignment of error is not well taken.

In support of his fourth assignment of error, appellant argues that he was denied his right to a fair trial when the prosecutor ignored an earlier ruling by the trial court and referred, in a written list he projected for the jury to view during rebuttal closing argument, to a witness's excluded testimony alleging that appellant said he should have killed the victim. The witness in question was a fellow inmate with appellant at the Wood County jail. The ruling made by the trial court came about as follows.

The prosecutor listed the inmate as a witness for the second trial. Pursuant to the original stipulation of the parties, he also provided a summary of the inmate's testimony to appellant. During the course of the second trial, and just prior to calling the inmate to testify, the prosecutor informed appellant's counsel that the summary of the witness's testimony needed to be supplemented. The prosecutor said:

"While Rule 16 does not apply, we, nevertheless, provided though earlier and I am now told by [the witness] over lunch hour that he has—he has expanded upon this prior statement to me and the prior summary that we provided to [appellant's counsel].

"So I would just out of courtesy, not out of the obligation under Rule 16 bringing [sic] it to the counsel and Court's attention. At this point the additional information basically involves more the details of Mr. Roughton's rape of [the victim]."

He then gave a verbal summary of some of the new details.

Appellant's counsel argued that the prosecutor was barred by estoppel and waiver from supplementing the discovery regarding the witness's testimony. The

trial court agreed, finding that the prosecutor had obligated himself by stipulation to provide appellant with summaries of witness statements. The trial court noted that he had ordered a discovery deadline that was long past. He ordered that the testimony of the witness be limited to what was provided in discovery, saying that his order amounted to granting a motion *in limine.*

The witness took the stand and began recounting a conversation he said he had with appellant in jail. According to the witness, appellant told him that he was going to assault a woman jailer the same way he had assaulted an old woman. Appellant told the witness that the old woman was bloody when he was finished, and that she was a relative of his of some kind through marriage. Then the following exchange occurred between the witness and the prosecutor:

"Q. Did he say whether that old woman was injured or not?

"A. Yes, he did.

"Q. What did he say about her being injured?

"A. She was, she was pretty bloody. Probably shoulda killed her instead."

The statement about killing the victim was not included in the witness summary provided to appellant before trial. Appellant immediately objected, arguing that the trial court's ruling *in limine* was violated. Appellant made a motion to dismiss, which the trial court denied.

The trial court then said that it would admonish the jury to disregard the last statement of the witness. Appellant's counsel said, "No. I want to cross examine him on it. It's not part of this statement." The trial court and counsel had further discussion about what should be done, and appellant's counsel asked for a chance to confer with appellant. The court took a brief recess. When they returned, appellant's counsel indicated that he would cross-examine the witness about the last statement, and that he did not want the court to give the jury any admonishment. He asked the court to bar any further reference to the statement following his cross-examination of the witness.

Appellant's counsel did cross-examine the witness about the "killing" statement. Prior to doing redirect examination of the witness, the prosecutor asked to approach the bench. The following discussion then took place:

"MR. MAYBERRY: I'm sorry to do that, but at this point I'm afraid of my own shadow. So I want to make sure I'm okay.

"THE COURT: I think we all are.

"MR. MAYBERRY: Mr. Grna got into some area I was not permitted to get into.

"THE COURT: You can inquire any [*sic*] area that Mr. Grna inquired into.

"MR. GRNA: Wait a minute but the—

"THE COURT: Yeah, let's kept [*sic*] the killing out.

"MR. MAYBERRY: That's fine."

No further reference was made to the "killing" statement until the prosecutor's rebuttal closing argument was made. The assistant prosecutor making the closing argument used a projection system to show the jury a written list of facts he argued were shown by the evidence. When he reached the testimony of the inmate from the jail, he said, "It's a fact that the defendant told [the inmate] that he should have killed her. The defendant said he should have killed—." At this point, appellant's counsel objected.

The following discussion then occurred at the bench:

"MR. GRNA: I've had enough. I've had more than enough. That was improper inquiry in light of everything that's gone on here. I move to dismiss. That was totally improper and with the total pattern here, Judge, he knew that he shouldn't have said that. They got it written down on a piece of paper. Judge, look at the piece of paper that's on that screen in front of them right now. I hope it's not in front of them right now. Is it?

"MR. MAYBERRY: Humn—

"THE COURT: Take it off. Take it off.

"MR. GRNA: I want this thing dismissed. It's—Judge this is ridiculous.

"THE COURT: I understand.

"MR. GRNA: I want them instructed. Something.

"THE COURT: Well, what kind of instruction do you want.

"MR. GRNA: Oh God.

"MR. DOBSON: May I respond, Your Honor?

"THE COURT: Let's find out what he wants.

"MR. GRNA: I want it dismissed pure and simple.

"THE COURT: Do you want some kind of instruction?

"MR. GRNA: I'll let you decide that, Judge. I want it dismissed.

"THE COURT: Well, I'm not going to rule then on your motion to dismiss at this time. You can raise it later.

"MR. GRNA: We agreed I could cross him on it, and you guys couldn't say anything more.

"THE COURT: No, no. He did not say that. He did not the [*sic*] instruction from the Court. My initial reaction it was may well be damn improper, but I'm

not going to interrupt this thing at this time. In it's, if it's, if it's subject to the motion you want, Mr. Grna, it will be subject to that motion later as well. Let's move on.

"MR. GRNA: Thank you.

"MR. MAYBERRY: Can we make something on record, Judge?

"THE COURT: If you want to—

"MR. DOBSON: Your Honor, you gave the defendant's attorney the opportunity to have that stricken from the Record. He had every opportunity.

"THE COURT: I understand.

"MR. DOBSON: He said himself that he didn't want to have that happen. If he, if—it's in the Record. He has had opportunity. We have the opportunity to comment just like he had the opportunity to cross.

"THE COURT: I'm going to consider the motion later. We will hear all the argument then. Don't need to now. Move on.

"MR. GRNA: Feel I got to put on the Record which might not come back to that what we had said was I would be allowed to cross examine and they wouldn't comment then any further. Then they went ahead and blocked that. You never asked it to be stricken, admonish the jury. I said no, don't admonish.

"THE COURT: I understand. Let's go."

The assistant prosecutor then completed his rebuttal closing and the case was submitted to the jury.

After the jury verdicts were returned, appellant renewed his motion to acquit. Both parties briefed the issue in writing. The trial court journalized a judgment entry on May 2, 1997, in which it said:

"The record reflects that the prosecution, in rebuttal closing argument, clearly displayed a written list of facts to the jury, of which one such fact directly referred to the 'killing' statement which the Prosecutor had been instructed by the Court to not further mention. This was not a remark by the prosecution 'in the tension and turmoil of trial,' but was done in a calculated and purposeful manner, despite the Court's prior ruling *in limine* and reiteration during examination of [the inmate witness]. Therefore, the Court finds that the Prosecutor's reference to the 'killing' statement in rebuttal closing argument was clearly improper.

"Having found the prosecutor's behavior to be improper, the Court must now consider whether such improper behavior prejudicially affected Defendant's substantial rights. *State v. Lott* [(1990), 51 Ohio St.3d 160, 555 N.E.2d 293]. In doing so, the Court considers the effect of the misconduct in the context of the

entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410 [613 N.E.2d 203, 209–210] citing *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 643–645 [94 S.Ct. 1868, 1871–1872, 40 L.Ed.2d 431, 436–438]; *Darden v. Wainwright* (1986), 477 U.S. 168, 181–182 [106 S.Ct. 2464, 2471–2472, 91 L.Ed.2d 144, 157–158]. The Court further considers whether such improper behavior was an isolated incident or part of a 'protracted series of improper arguments.' *Id.*

"The record of the retrial reflects numerous instances of the prosecution's reckless disregard for Defendant's right to a fair trial. First, the State disclosed photographs of microscopic slides immediately before trial. The State acknowledged that the microscopic slides had existed for several months and had not been shared in discovery, leading the Court to order the exclusion of all DNA evidence and testimony. Second, the State elicited contradictory testimony from two investigating officers on successive days and later advised the Court that it was aware of the contradictory testimony but did not advise Defendant. Third, the State elicited testimony from [the inmate witness] beyond that which was shared with Defendant in discovery. Finally, the State placing in written form before the jury the comment of [the inmate witness] after being advised by the Court to 'keep the killing out' certainly comprises prosecutorial misconduct.

"Reviewing the entire record, the Court finds that the numerous incidents of improper conduct collectively and cumulatively constituted prosecutorial misconduct. It is the Court's finding however that as these matters were brought to the Court's attention in a timely fashion by counsel for Defendant, the Court's rulings protected and maintained Defendant's substantial right to a fair trial."

The state argues that it had no obligation under Crim.R. 16 to provide appellant with a summary of the inmate witness's testimony. Therefore, the state contends, the trial court's order *in limine* was in error. The state next argues that it was not responsible when its witness violated the order *in limine* because it had instructed him not to go beyond the information that was in the written summary. Finally, the state argues that once appellant chose to cross-examine the witness about the statement, rather than to have the jury instructed to disregard the statement, appellant placed the statement into the record for consideration by the jury.

Even assuming *arguendo* that the provisions of Crim.R. 16 did not compel the state to provide appellant with a summary of the testimony of the inmate witness, we agree with the trial court that once the state agreed, through stipulation, to provide appellant with the summary, it had an obligation to provide a complete summary. Accordingly, we are unpersuaded by the state's contention that the initial ruling *in limine* was error.

■ We are also unpersuaded that the prosecution did nothing wrong when it discussed and displayed the "killing" statement during its rebuttal closing. We agree that generally counsel are able to refer to any evidence from the trial in closing argument. However, under the unique circumstances of this case, that general rule was altered by an *in limine* order of the trial court.

As we have already discussed, the trial court initially issued an *in limine* order that prohibited the state from introducing testimony about the "killing" statement. When that order was violated, appellant made a tactical decision to try to lessen the damage by cross-examination. Appellant then renewed his motion *in limine* prior to the state's redirect. The trial court granted the renewed motion *in limine* when it directed the prosecutor to keep the killing statement out.

While the procedure employed by the trial court was somewhat unusual, we cannot find that it abused its discretion when it crafted an *in limine* order designed to minimize the damage done by the prosecution's improper introduction of evidence and to protect appellant's right to a fair trial. We therefore agree with the trial court that the actions taken during rebuttal closing constituted prosecutorial misconduct.

We now turn our consideration to the standard set by the Supreme Court of Ohio for reversing a conviction based upon prosecutorial misconduct. The Supreme Court of Ohio has said:

■ "Ohio courts have suggested that the effect of counsel's misconduct 'must be considered in the light of the whole case.' See, *e.g.*, *Mikula v. Balogh* (1965), 9 Ohio App.2d 250, 258 [38 O.O.2d 311, 315–316, 224 N.E.2d 148, 154–155]. And where misconduct of counsel ' " * * * is of such a prejudicial character that the prejudice resulting therefrom cannot be eliminated or cured by prompt withdrawal, and admonition and instructions from the court of the jury to disregard it, a new trial should be granted, or the judgment reversed, notwithstanding cautions, admonition, and instructions by the trial judge." ' *Book v. Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 401 [43 O.O. 334, 338–339, 96 N.E.2d 289, 293–294].

■ "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. *State v. Papp* (1978), 64 Ohio App.2d 203, 211 [18 O.O.3d 157, 162, 412 N.E.2d 401, 407]; *State v. Wade* (1978), 53 Ohio St.2d 182, 186 [7 O.O.3d 362, 364, 373 N.E.2d 1244, 1247]; *State v. DeNicola* (1955), 163 Ohio St. 140, 148 [56 O.O. 185, 189, 126 N.E.2d 62, 66–67]; *Scott v. State* (1923), 107 Ohio St. 475, 490–491 [141 N.E. 19, 23–24]. This, then, is the point at which we begin in our analysis of this issue.

" * * * *

"[W]e are constrained to keep in mind that '[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.' *Dunlop v. United States* (1897), 165 U.S. 486, 498 [17 S.Ct. 375, 379, 41 L.Ed. 799, 803].

"Recently, in *State v. Smith* (1984), 14 Ohio St.3d 13 [14 OBR 317, 470 N.E.2d 883], we considered another case involving prosecutorial misconduct. We found at 14 [14 OBR at 318–319, 470 N.E.2d at 885] that the prosecutor's personal attacks and accusations against defense counsel went so far beyond 'the normal latitude allowed in closing arguments' that a fair trial was made impossible. In *Smith*, the prosecution argued that its improper comments were harmless in view of the sufficiency of the evidence to sustain a conviction. It further contended that prejudice was eliminated because the jury was instructed that closing arguments were not evidence. In light of the circumstances of the case, we found these claims to be without merit, and held: '[T]he general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error. * * * In view of the fact that improper insinuations and assertions of personal knowledge by the prosecution are apt to carry great weight against the accused when they should properly carry none * * * some more definite guidance from the court was required.' *Id.* at 15 [14 OBR at 319, 470 N.E.2d at 886].

"Important to our disposition of the instant issue is our observation in *Smith* that '*it is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty.' Id.*" (Emphasis added.) *State v. Maurer* (1984), 15 Ohio St.3d 239, 266–267, 15 OBR 379, 402–403, 473 N.E.2d 768, 792–794.

Keeping this standard in mind, we have carefully reviewed the record.

The following information was presented through testimony at trial. At one time appellant was married to a step-granddaughter of the victim. The trailer where the victim was attacked was the residence of several different family members at various times.

Just before the victim moved into the trailer to live by herself, appellant and his family lived in the trailer. The lock on the back door of the trailer was broken when appellant and his family lived there, and it was still broken when the victim moved into the trailer.

The victim testified that she went to bed around 10:30 in the evening and was awakened sometime after she went to sleep. She estimated that the attack occurred sometime between eleven o'clock the evening she went to bed and four o'clock the next morning. The victim graphically described how she was raped anally and how she was forced to perform oral sex on her attacker while he performed oral sex on her. She testified that after she was initially thrown to the floor, her attacker moved her back onto her bed and continued to repeatedly attack her there. Her medical caregivers confirmed the injuries she suffered as a result of the rapes, and confirmed that she had to undergo surgery as a result of the injuries.

The victim also testified that her attacker told her to put $500 in cash in her mailbox before she went to bed the next night. He threatened to kill her, her children and her grandchildren if she told her family or the police and if someone waited for him when he returned to get the money. After he left, the victim was unable to get up right away, and believes that she may even have passed out for a time. When she was able to get up, she called the son who lived closest to her, around four o'clock in the morning, and told him she needed help. She did not explain why.

The son testified that he thought his mother was having a medical emergency, and he had his wife call 911 as he left to go to his mother's house. When he arrived at her house, a police officer was already with her. He learned that his mother had been attacked, and waited with her and the police officer for emergency medical personnel. He went to the hospital with his mother and heard her give detectives a description of her attacker. Based upon the description, he told the detectives to look at appellant as a suspect.

The first police officer from the Northwood Police Department to arrive at the victim's trailer thought that he was responding to a medical emergency. The victim told him she had been sexually assaulted both anally and vaginally, and she was bleeding profusely. He called to ask the dispatcher to speed up the arrival of the emergency medical personnel. The victim said that she would rather talk to a female detective about the details of the attack, so he did not press her for specific details. He kept everyone who subsequently arrived at the trailer away from the bedroom where the attack happened and away from the living room near the bedroom.

He said that it was raining outside and was "miserable" when he and another officer took a walk around the trailer after the victim was taken to the hospital. The officer and a detective said that they found the back door of the trailer ajar. They also found two footprints in the mud outside the back door. The officer testified that the footprints were pointed toward the trailer; the detective testified that the footprints were pointed away from the trailer. The officers did

not try to protect the footprints from rain that was falling and did not try to take casts of the footprints.

The victim never saw her attacker's face, but she could describe his general build. She also noticed that he smelled of cigarette smoke and that he spoke with a drawl. She said that he was wearing dark sweat pants, a dark sweatshirt, black sneakers and a stocking mask over his face. Finally, she believed that he knew her family because he made statements to her during the attack that showed he knew she was separated from her husband and he said the name of one of her sons. The son named by the attacker was the stepfather of appellant's second wife.

Two police detectives staked out the victim's trailer the evening after the attack to see if the attacker returned for an envelope of money. They saw a large white car stop for a short time at the victim's mailbox. After the car left, a detective checked and confirmed that the envelope they left in the mailbox was gone. The detectives were able to see the color and make of the car, and five out of six numbers on the license plate. When they ran the ten possible combinations to figure out the sixth number on the plate, they discovered that a large car with the first five digits seen by the officers was registered to appellant. One of the officers who saw the car stop also saw a shadowy outline of the driver. She testified that the profile she saw matched appellant's profile.

An officer from the Northwood police department went to the home where appellant was living shortly after midnight. Appellant was upstairs in bed when the officer arrived. Appellant dressed and voluntarily went with the officer to the police station for questioning. Before they left for the police station, he acknowledged that a white Buick parked near the house was his, and gave the officer the keys to the car so the officer could search the car. The officer was looking for the envelope with paper inside. He did not find the envelope, and did not notice any mud or blood stains in the car.

Appellant waived his *Miranda* rights and spoke with a detective when he arrived at the police station. He said that he was helping a friend fix a car around midnight on the night of the attack. However, he was not able to give the name or address of the friend to the detective. He said that he was at his first wife's home between three and four o'clock in the morning when the victim was attacked. He first said that he was not in the trailer park the next night, when the envelope was taken from the victim's mailbox. However, he eventually said that he was in the trailer park to visit a daughter of the trailer park owner.

The daughter of the trailer park owner testified that she and her husband were not friends of appellant. She said that he had never been invited to her home and that he did not visit her and her husband on the night the envelope was taken from the victim's mailbox.

A fellow inmate of appellant at the Wood County jail testified that appellant had threatened to assault a woman guard at the jail and to make her bloody just like he did the old woman. He said appellant told him that the old woman was his ex-wife's or wife's grandmother through marriage. He said that he heard appellant talk with his ex-wife on the phone several times and that appellant told her not to tell the police the right time he got home. He threatened her that if she did not do as he asked, she would be next.

The inmate admitted on cross-examination that he was in jail with a high bail because he was indicted for intimidating a witness. He also admitted that two days after he told jail employees about appellant's statements, he was released from jail on his own recognizance. He subsequently entered into a plea bargain, pleaded guilty and received a sentence of probation, rather than jail time. He said that he was not aware of any connection between his plea bargain and the information he provided about appellant.

He admitted that appellant told him that someone else named Joe actually raped the old woman. Appellant said that he did not rape the woman. Appellant told the inmate that he and the other person stole some items from the old woman's trailer, but threw them away so they wouldn't get caught.

Appellant's brother testified that around a week prior to appellant's arrest for these crimes, appellant came to his house. He testified:

"I don't know in this case or what it was, but he came in one day and he come in he goes 'Well, I think, I fucked up this time.' 'What do you mean?' He goes, 'Yeah, I think I fucked up big time.' I go, 'For what?' He says, 'Ah, just forget it.' I said, 'All right then.'"

He also testified that his brother regularly smokes cigarettes.

On cross-examination, he said that he did not know what his brother was referring to when he made the quoted statement, and he still did not know what his brother was talking about. He also admitted that he could not remember if appellant made the statement before or after the date the victim was attacked; all he could remember is that it was before appellant got arrested.

The state then rested. Appellant called one witness—his first wife. She testified that appellant was separated from his second wife and was living with her and their two children on the date the victim was attacked.

She said that appellant was in an auto accident in 1994, and suffered from neck and back pain thereafter. She said that he cannot even lift a bag of groceries because he is in constant pain. He has had back surgery and physical therapy for his injuries. She also testified that he had a knee surgery in April 1996. She said that he wore a knee brace all the time except for when he went to bed.

Finally, she testified that on the date the victim was attacked, appellant had a case of scabies, which he got from her.

She said that she woke up at 2:45 a.m. the morning the victim was attacked. She went to the bathroom. While there, she looked out of the bathroom window and saw appellant get out of his car. She heard him coming into the house.

At 3:00 a.m. she went downstairs. She saw appellant lying on the floor asleep in front of the couch. Their son was sleeping on the couch. She tried to wake appellant up. She said that he was wearing light blue shorts and a white tank top. She could not awaken him, so she went back to her bedroom.

She got up again at 3:45 a.m. and began to get ready for work. She said that she went downstairs at 4:55 a.m. and tried to wake appellant again so he could drive her to work. She said that they only had one car and it was supposed to rain that day. She said that she used a spray bottle to spray water on appellant's face to awaken him. She concluded that he had taken pain medication because the medicine bottle was moved, and he did not quickly respond to the water. She said that he did eventually wake up, but she did not let him drive her to work. Instead, she took the car and drove herself to work.

She said that she did not see any blood or mud in the car. She opened the trunk to get an umbrella before she went into work, and did not see any blood or mud there either. She said that she never removed any evidence from the car. She said that appellant never threatened her regarding her testimony.

On cross-examination, she admitted that she had altered the times events happened in a handwritten account she wrote to remind herself of the events that happened at her house on the morning that the victim was attacked. She said that she was confused when she wrote the account by announcements that she had heard on the radio about concert times. She also admitted that she had written that she poured a cup of water on appellant's face, not that she had sprayed him with a spray bottle.

■ We have carefully considered all of this evidence and have concluded that it is clear beyond a reasonable doubt that absent the prosecutor's comments, the jury would have found appellant guilty. Accordingly, appellant's fourth assignment of error is not well taken.

In support of his fifth assignment of error, appellant argues that the trial court committed prejudicial error when it did not give a jury instruction that told the jury that any facts necessary to support an inference must be proved beyond a reasonable doubt. Appellant says:

"[A]s described in the statement of facts, the police allegedly saw part of a license plate number (direct evidence), from which the jury was to infer (infer-

ence layer 1) that, since Appellant's car shared that part of the plate number, it was Appellant's car; then to infer (inference layer 2) that Appellant was driving the car; then to infer (inference layer 3) that since Appellant was driving the car, it must have been him who had told the victim to put the money in the mailbox, and hence who had committed the rape."

Appellant complains that the jury could have believed, based upon the jury instructions the trial court gave, "that so long as the underlying facts seemed 'reasonable', even if not established beyond reasonable doubt, that would be a sufficient basis upon which to make multiple layers on inference."

The state responds that the jury instructions in this case were sufficient and did not prejudice appellant. The state contends that the trial court correctly told the jury it could not base an inference solely upon another inference. It also argues that when the jury instructions are viewed as a whole, the only conclusion to draw is that no prejudicial error occurred.

The Supreme Court of Ohio has ruled:

" '1. An inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury.'

" '2. An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury.' " *State v. Palmer* (1997), 80 Ohio St.3d 543, 561, 687 N.E.2d 685, 701–702 (quoting *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraphs one and two of the syllabus).

The instruction the trial court gave about which appellant now complains was:

"Now evidence maybe [*sic* ] direct or circumstantial or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies. It does include the exhibits admitted into evidence. Circumstantial evidence is the proof of facts or circumstances by a direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow according to the common experience of mankind.

"To infer or to make an inference is to reach a reasonable conclusion of fact which you may, but are not required to, make from other facts which you find have been established by direct evidence. Now whether an inference is made rests entirely with you. You may not infer facts solely from other inference. You may draw an inference which is based in part upon another inference and in part on established fact if you find that to be reasonable."

We find that the instruction given falls within the parameters established by the Supreme Court of Ohio. Therefore, the trial court did not err in giving the instruction, and appellant was not prejudiced by the instruction.

Furthermore, we find that the jury did not have to rely upon an inference upon an inference to reach the conclusion that appellant was driving the car that stopped at the mailbox to get the envelope stuffed with paper. A detective testified that she saw the shadowy outline of the driver and that the profile of the driver matched appellant's profile. Appellant admitted that he drove his car in the trailer park that evening, although he said that he was there one or two hours earlier than the time the detectives saw the car stop for the envelope. The jury could have believed, therefore, that appellant was the driver of the car and that his time frame for being in the trailer park was not accurate. Finally, the jury could have decided that appellant was the one who was in the trailer and who raped the victim based upon the statements his fellow inmate testified he made in the Wood County jail. Accordingly, appellant's fifth assignment of error is not well taken.

In support of his sixth assignment of error, appellant argues that he is entitled to a new trial because the prosecutor prevented him from examining potentially exculpatory evidence by failing to timely disclose the existence of the evidence. Specifically, appellant points to the state's failure to tell him on a timely basis that BCII had microscope slides containing DNA material in its possession. To understand the potential value of the evidence, it is necessary to first understand the role DNA evidence had in the case.

Prior to his retrial, appellant and the state filed several motions. The trial court held a hearing on January 31, 1997 to allow counsel to present arguments relating to those motions. In the course of the arguments about the various motions, counsel made statements to the court regarding the reports of their experts about DNA tests that were done. During one argument Mayberry told the court:

"[A]t the time of the arraignment Court will recall * * * that I did indicate on that very first appearance that we had DNA. I indicated what the results of the DNA were. I indicated that it showed one in 109 million people matched this defendant."

During another argument appellant's counsel told the court:

"[O]ur DNA expert said he tested the bedsheet immediately adjacent to the area where the prosecution had tested the bedsheet [and] this stain. He told me there were no spermatazoa and no nucleated cells there. He found it almost impossible to believe because there were nucleated cells there. You can't get a

valid DNA test because DNA is in the nucleated cells, and there were no nucleated cell[s] within or one millimeter from where they tested."

On March 11, 1997, just before opening statements were given in the second trial, assistant prosecutor Dobson told the court and appellant's counsel for the first time that BCII had microscope slides containing DNA material that had nucleated cells. The following exchange took place:

"MR. DOBSON: Just, Your Honor, in the interest of the Record and in answering questions that had been asked by Mr. Grna on the Record yesterday not continuing any argument or anything objection the Court already ruled on the photographs. We found out what we submitted were taken, I believe, it was the beginning of February. The photographs were actually taken of photographs of the slides were taken February of 1997.

"THE COURT: And the slides were taken?

"MR. DOBSON: The slides I believe were taken at the time that the—

"THE COURT: Back in July or sometime like that?

"MR. DOBSON: Yes, Your Honor.

"THE COURT: Okay.

"MR. DOBSON: Again and it's not in furtherance of our argument just—

"THE COURT: For the record. Anything for the Record, Mr. Grna?

"MR. GRNA: I'm not interested—what are the photographs of now?

"THE COURT: I'm talking about—

"MR. DOBSON: Of the nucleated cells, Your Honor. The lab did not have apparently the photographic capability. There was a sample a salesman that came through and they at the time that this was becoming an issue with [the defense expert]. They said well since this was an issue can we use your equipment and give us an example using these slides and that's when they were taken.

"THE COURT: What you're saying the slides were done at the time of the examination was done?

"MR. DOBSON: As microscope slides, yes.

"THE COURT: In June of or July '96 or thereabouts. They were not converted to prints until first part of February of '97.

"MR. DOBSON: Slides I'm talking about a glass slide that goes into micro- scope. Slides as opposed to a slide that you would put on a screen.

"THE COURT: All right. Fine.

"MR. GRNA: We got a problem then if I'm understanding things correctly that means the nucleated cells existed. I was never given them for testing. If they took pictures of them in February, the nucleated cells are somewhere available for testing. I never got them. I just thought these were taken and then cells were destroyed. So we got the same problem we had the first trial.

"THE COURT: Where are they today?

"MR. GRNA: I can't get those tests for 6 to 8 weeks. They already told me that.

"THE COURT: Well what is what was the intent of the State to do with these slides at trial?

"MR. MAYBERRY: None. Nothing.

"MR. GRNA: Yeah, but if the cell—

"THE COURT: Why wouldn't you have thought they should be shared in discovery?

"MR. MAYBERRY: Your Honor, they are. I don't know how we share microscope slides in discovery.

"MR. GRNA: Just like you did the bed sheet.

"THE COURT: You pick it up and hand it.

"MR. GRNA: I mean everybody knew I wanted to test the DNA and tell if the cells existed. If the cells—

"THE COURT: Well if the cells existed.

"MR. GRNA: That's what I thought you said.

"MR. MAYBERRY: I thought he asked for bed sheet to be tested, Judge. I don't recall him asking for any slides.

"MR. GRNA: I didn't know if there was nucleated cells.

"THE COURT: Without regard with what was asked for, why doesn't the discovery Rule 16 provide that you share those slides in discovery?

"MR. MAYBERRY: Judge, Criminal Rule 16 says evidence intended to be used by the State or which is exculpable. Neither of which applies to slides that we can't bring into the courtroom. We can't do anything with them, and two, if they're nucleated cells on them certainly they're not exculpatory.

"THE COURT: You're correct if there's nucleated cells. Supposen there [*sic*] not nucleated cells, doesn't the defense have the right to determine that for themselves?

"MR. MAYBERRY: That's as I understand the purpose that the photographs were taken to and shared with the defense as his photographs were shared with us.

"THE COURT: Well I'm not going to deal with the matter at this time.

"MR. GRNA: Judge, I'm right back to where we started from at the first trial, and I cannot go forward. I can't—how am I going to do effective cross examination? How am I going to do anything with my expert? I could test these nucleated cells and determine my client's DNA if, in fact, there are DNA nucleated cell. That's where I, I'm back where I was in December. That's outrageous. That's totally outrageous. Completely out of line.

"THE COURT: Okay.

"MR. GRNA: I, I'm going to move to dismiss."

The court said it would wait until the next morning to deal with that motion and said counsel should proceed with opening statements. Appellant's counsel then said:

"Well then I move for exclusion of his DNA evidence that's the only solution. I move for total exclusion of any DNA evidence. Total exclusion. That should be my remedy right now.

"Judge, this is, this is not the first time around the block and this is December when we had the initial trial. That is the sanction you can apply according to the civil, according to Criminal Rule 16. I want total and complete exclusion of any DNA evidence. I can't do my opening now. Again. Second time. He's been in jail almost 200 days whatever the figure is, 150, 160 days. Now I shouldn't be placed in this position, Your Honor, where I can't do my opening. It should be exclusion, and if you don't want exclusion then dismiss. I think its [*sic*] 16(d).

" * * *

" * * * I don't want a continuance. He's been in jail too long. I don't want to continue one more minute."

The court then asked appellant's counsel if a discovery request was made that would cover the slides. The answer was yes, the request was made in October. Mayberry then said:

"Your Honor, in coming to court this afternoon just telling the court when these photographs were taken it was purpose of clarification and providing full information to counsel and to the Court about when these photographs were allegedly taken of a microscopic glass slide which I cannot stand here and before the Court tell you whether there's any evidentiary value whatsoever in a glass slide.

"They, as I understand it, and I'm not the one who did the testing. The DNA was not tested from whatever is contained on the glass slides. I don't even know if you can test DNA from whatever is on the glass slides. The sheet, which was supplied to the defense, the cutting from the sheet. It's about this size, and I wasn't even a party to what items were turned over to the defendant and his expert through the Court Reporter and through BCI to know what was given and what was not given to the defendant. But it's my understanding that the DNA test was not done or what is on these microscopic glass slides, but a separate test taken from the sheet which his expert had equal access to."

The trial court called a recess and had counsel for appellant and for the state call their respective experts to learn whether the slides had value to the defense. When they returned to court, the prosecutor reported that his expert told him that he had "never seen DNA material obtained from a slide." The prosecutor also argued that appellant was given the best evidence when he was given a cutting from the stain found on the sheet. He said:

"The purpose of a slide initially is to look for sperm cells in doing a conclusionary test to see if there are sperm cells to conclude that it is semen. In looking at those cells and finding nucleated, nucleated cells, which were, however not, in fact, sperm cells. They contained no evidentiary value and were set aside. The entire sheet, not slides was sent to Lab Corp. for DNA testing. Had they had evidentiary value they would have also been sent to Lab Corp. The State's own expert which they were not."

The prosecutor also reported that his expert had directly contacted appellant's expert (without the knowledge of appellant's counsel) to offer to review all the material, including the slides, to see if they could resolve why they reached different test results.

Appellant's counsel reported that his expert would need to see the slides before he could say whether they had any value. The expert said that he did not know about the slides and, had he known about the slides, he would have told appellant's counsel to get them.

The trial court said:

"Do I understand correctly what I have before me from defense is a motion basically to suppress or a Motion In Limine to exclude all testimony and evidence in this case with regard to DNA on the basis of the State's failure to comply with discovery rule, under rule Criminal Rule 16 of disclosing the existence of the slides which may have, may have given the defense determination as to whether or not there were nucleated cells available for testing when it is the defense's position that no nucleated cells exist for testing? Have I stated the issue before me?"

Appellant's counsel replied, "I think so. Other than it's a discovery sanction under the rule."

After considering all the information presented, the trial court granted appellant's motion to exclude all evidence relating to DNA in the second trial. No evidence relating to DNA was introduced or referred to during the trial.

Appellant is now arguing that even though the trial court's ruling prevented the state from using DNA evidence to inculpate him, he was still denied a fair trial because he was not allowed to examine the evidence and to use it to exculpate himself. Appellant points to a decision of the United States Supreme Court, *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and to its progeny, to support his proposition that the state had an obligation to inform him of the existence of potentially exculpatory evidence. Appellant argues:

"The material is alleged by the State to have come from semen taken from the mouth of the victim, who was orally raped. If Defendant's experts determine by testing that the Defendant is excluded from being the source of that material, the evidence will actually exculpate the Defendant. If it is determined that there is a high probability that the material came from the Defendant, it will not actually exculpate the Defendant, and in fact will be evidence of his guilt."

Appellant argues that he must be given the opportunity to have the DNA evidence tested by his experts, which could exonerate him of the crimes in this case.

The state responds by presenting the same arguments it made in the trial court. First, it argues that it had no obligation to provide the microscope slides to appellant because they were not results or reports required to be disclosed under Crim.R. 16. The state says the microscope slides are "intermediate *procedures*" that were used to formulate the lab reports. The state cites an unreported case from the Fourth District Court of Appeals, *State v. Montgomery* (Mar. 29, 1996), Washington App. No. 94CA40, unreported, 1996 WL 141675, to support its argument.

Our reading of the cited case fails to show any support for the prosecutor's position in this case however. The *Montgomery* court explained in that case the appellant objected at trial "to the State's F.B.I. expert's testimony regarding the third test he used to obtain the result appellant received in discovery. Three separate tests performed by this expert witness reached this same result. Appellant indicated that he was aware of the first two tests used to obtain the result but was never given discovery by the State concerning the third test: the microspectrophotometer test."

The court followed an earlier ruling "that a copy of the report of the test results complies with Crim.R. 16(B)(1)(d) and that the testing procedures leading to the results of the test is [*sic* ] not required." *Id.*

In this case, appellant is not complaining that he was not told of methods used to reach test results. Instead, he is complaining that he was not told of the existence of physical evidence that he could have independently examined by his own expert. We agree with the trial court that the state was compelled by Crim.R. 16 to tell appellant about the existence of the microscope slides.

The state next argues that even if it breached Crim.R. 16 by not telling appellant about the microscope slides, the correct remedy was applied by the trial court in this case when it excluded the information. The state says that no new trial is required and the violation in question is not a *Brady* violation.

The *Brady* decision referred to by both parties established the rule that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. The United States Supreme Court explained, "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.*

In subsequent cases, the United States Supreme Court explained when withheld evidence is considered material. The court said:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494.

The court further explained:

"*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley* (1995), 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506.

The United States Supreme Court has also indicated, in two separate cases, that the constitutional right acknowledged in *Brady* may be expanded to apply to

potentially exculpatory evidence. In each case, the court has been asked to consider whether a failure of the police to preserve potentially exculpatory evidence was a breach of due process rights of the defendants.

In the first case, *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413, the court considered whether the state was required to preserve potentially exculpatory evidence—breath tests taken before drivers were charged with driving under the influence. *Id.* at 481, 104 S.Ct. at 2530, 81 L.Ed.2d at 417. The court said:

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.' *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867 [102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193, 1202] (1982). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

" * * * A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. *Brady v. Maryland,* 373 U.S., at 87 [83 S.Ct., at 1196, 10 L.Ed.2d, at 218–219]. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Trombetta,* 467 U.S. at 485, 104 S.Ct. at 2528, 81 L.Ed.2d at 419–420.

The court also explained, "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.

The *Trombetta* court ruled that the breath tests did not meet the standard of constitutional materiality because they did not have an apparent exculpatory value before they were destroyed and the drivers were able to get comparable evidence by other reasonably available means. *Id.* at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. The court said:

"Although the preservation of breath samples might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that preserved samples would have been exculpatory. * * * In all but a tiny fraction of cases, preserved breath samples would simply confirm the

Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration at the time of the test. Once the Intoxilyzer indicated that respondents were legally drunk, breath samples were much more likely to provide inculpatory than exculpatory evidence." *Id.*

The court went on to say that the drivers had several alternative methods available to them to challenge the accuracy of the Intoxilyzer tests. Therefore, the court found the state had no duty to preserve the potentially exculpatory breath tests. *Id.* at 491, 104 S.Ct. at 2535, 81 L.Ed.2d at 423–424.

In the second case, the United States Supreme Court considered whether a defendant was denied due process of law when police failed to properly preserve evidence relating to the molestation and rape of a boy. *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281. When the boy was treated at the hospital following the rapes, a physician took samples for a sexual assault kit and turned the samples over to the police. Those samples were properly preserved by refrigeration. However, the boy's clothing that was taken as evidence by the police at the hospital was not refrigerated. As a result, no definitive DNA tests could be done on the stains found on the boy's clothing. The prosecution informed the defendant about the failure to refrigerate and preserve the evidence before trial. Armed with the information, the defendant called experts at trial who testified that if the clothing were frozen or refrigerated, DNA tests could have been done that could have exonerated him.

The *Youngblood* court noted that the state complied with constitutional requirements to inform the accused of evidence favorable to him. *Id.* at 55, 109 S.Ct. at 335–336, 102 L.Ed.2d at 287–288. The court said that the question before it was whether the state had an even greater constitutional duty: to preserve potentially exculpatory evidence. The court acknowledged that the DNA evidence in question had a greater likelihood of enabling the accused to exonerate himself than did the breath tests in *Trombetta.* The court then said:

"The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. * * * We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant

can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 57–58, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

The court emphasized, "None of this information was concealed from respondent at trial, and the evidence—such as it was—was made available to respondent's expert who declined to perform any tests on the samples." *Id.* at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 290. The court said that the record did not support a finding of bad faith on the part of the police and affirmed the conviction of the defendant in that case.

While *Trombetta* and *Youngblood* are not directly on point with this case because we are not faced with a situation where police destroyed potentially exculpatory evidence, we find the rulings instructive in this regard. Both cases support the conclusion that an accused has the right to be informed by the prosecutor of all potentially exculpatory evidence and to be informed before trial if the potentially exculpatory evidence existed but was not preserved. It follows, therefore, that an accused has the right to know about and to examine, before trial, all potentially exculpatory evidence that is properly preserved.

The state argues in this case that the microscope slides in question were rendered "moot" by the trial court's ruling excluding all DNA evidence from trial. We disagree. The trial court's ruling did protect appellant from being inculpated by the DNA evidence, but it did nothing to allow him to use the evidence to exonerate himself. The crux of the *Brady* ruling and its progeny is that an accused does not receive a fair trial when the accused is not given knowledge of potentially exculpatory material evidence or the opportunity to examine it and to present it at trial.

In this case, the prosecutor did not tell appellant that microscope slides containing nucleated DNA cells existed until moments before opening arguments were presented in his second trial. The timing of the disclosure deprived appellant of the opportunity to have his expert examine the slides.[1] The state knew from appellant's disclosure of his expert's report that the existence or nonexistence of nucleated DNA cells was crucial to appellant's defense. Under

---

1. While neither party has presented any argument in this case that *Brady* and its progeny do not apply because the potentially exculpatory evidence was revealed just before trial rather than after trial, we acknowledge that our own research in this case uncovered some dispute on that issue. However, we agree with the reasoning of the Second District Court of Appeals that a "bright-line rule that previously withheld exculpatory material discovered by the defense during trial may never form the basis of a *Brady* claim" must be rejected in a case "where other remedies were not readily available to the defendants, the evidence was undoubtedly material * * *, and the finder of fact did not actually weigh the exculpatory evidence in reaching a verdict * * *." *State v. Aldridge* (1997), 120 Ohio App.3d 122, 146, 697 N.E.2d 228, 243.

the circumstances of this case, we conclude that the DNA evidence was material. We also conclude that the suppression of the DNA evidence undermines confidence in the outcome of the trial. Accordingly, appellant's sixth assignment of error is well taken.

In support of his seventh assignment of error, appellant argues that the cumulative effect of all the errors we have already discussed deprived him of a fair trial. However, our disposition of the sixth assignment of error renders the seventh assignment of error moot.

The judgment of the Wood County Court of Common Pleas is reversed. This cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MELVIN L. RESNICK and KNEPPER, JJ., concur.