OPINION
Defendant-appellant, James Mills, appeals his convictions of rape,[1]
kidnapping, [2] and theft [3] in the Butler County Court of Common Pleas. We affirm his convictions.
On December 31, 1998, T.W. drove her 1987 Pontiac Sunbird from her home in Camden, Ohio, to the home of Jennifer Lakes on Vine Street in Hamilton, Ohio, to attend a birthday party given for Rachel Carter. When T.W. arrived, Rachel was not there. T.W. left the house at approximately 7:00 p.m. and went to a Hamilton bar called Cindy's Pub.
Since it was New Year's Eve, the bar was crowded. At the bar, T.W. talked to several people she knew from previously working there. T.W. met appellant, who had arrived earlier at the bar with his girlfriend. T.W. had not known appellant before that night. On a couple of occasions, appellant approached T.W. and spoke to her.
T.W. stayed at the bar until 1:45 a.m. While there, she drank six to twelve beers. As T.W. prepared to leave, she retrieved her jacket and purse from the bartender, who had kept them behind the bar for her. T.W. spilled her purse on the floor, and appellant helped her pick up her things. T.W. then left the bar and walked to her car in the parking lot. As she was getting into her car, appellant approached T.W. and asked her if she could give him a ride home. Appellant wore no coat, even though the weather was cold, and he told her that he would have to walk if she did not give him a ride. Appellant told T.W. that it would take only a few minutes to drive him home. Although T.W. was not even sure of appellant's name at that point, she agreed to drive him home.
As they drove, T.W. decided that she would drive down Vine Street to see if her friends were still at Jennifer Lakes' house. T.W. drove past the house, noticing cars there. She did not stop at the party. T.W. then proceeded to drive appellant to the west side of town, with him directing her. T.W. believed appellant purposely tried to confuse her by directing her to drive through several alleys then telling her to turn around. Finally, T.W. became frustrated and told appellant just to tell her where he lived. At that point, appellant told T.W. to drive down another alley and pull into a driveway at the back of a house.
When T.W. parked the car near a garage, the two talked for several minutes. Although T.W. had not met appellant before that evening, he knew that she had three children and asked to see their photos. T.W. refused. Appellant got out of T.W.'s car and went to the garage, purportedly to show T.W. photos of his own children. Although T.W. initially followed him, she began to feel uncomfortable and went back to her car.
T.W. had told appellant that she had to leave, but he unexpectedly got back into the car. When appellant asked T.W. for a goodbye kiss, she refused. T.W. noticed that appellant's pants were open and his penis exposed, and she began to become frightened. Despite T.W.'s refusal to kiss him, appellant pulled T.W. to him by grabbing her jacket. When she protested, appellant jerked her, and she began to fight him by hitting and scratching him. Appellant punched T.W. in the face and the eye, and told her to stop fighting him or he would continue to hit her. T.W. stopped struggling after appellant hit her.
During the scuffle, appellant had undressed T.W., pulling off her jacket and shirt. Appellant hit T.W., then pulled down her jeans partway and placed his penis in her vagina. Appellant ejaculated. At one point, T.W. was on top of appellant in the car's passenger seat. After he had finished having sex with T.W., appellant got into the driver's seat of the car while T.W. was in the passenger's seat.
Appellant then told T.W. that he could not let her go because of what he had done to her face. Appellant said that he would take her to the river. T.W., who knew bodies had been discovered in the river, believed that appellant meant to kill her. T.W. begged him to release her and even said that she would tell her husband that she had gotten into a fight at the bar. Appellant refused to let her go.
When appellant pulled onto a gravel driveway near the river, T.W. got out of the car and ran. She wore only her shirt and jeans, and no shoes. She ran to the nearest home, where the residents let her in. When Officer Dennis Valentine arrived, he noticed that T.W.'s left eye had already started to swell. T.W. told police that she thought appellant's name was Timmy Smith, and she described a sun tattoo on appellant's arm. T.W. also told police that the bartender kept a camcorder running in the bar at all times, and the bar might therefore have a tape from which she could identify appellant. Hospital personnel collected vaginal fluid from T.W. using a sexual assault evidence collection kit ("rape kit").
Detective Steve Rogers began his investigation in January 1999. He obtained a videotape from the bartender, Cindy Mayer, which depicted seven hours of events inside the bar. T.W. viewed the videotape and identified appellant as her assailant. After speaking to several people who had been in the bar that night, Detective Rogers was able to identify appellant, and the detective spoke to appellant about the crime. Appellant acknowledged that he had ridden with T.W., and he claimed that they had gone to a party. Appellant denied that he had sex with T.W.
Detective Rogers obtained a blood sample from appellant. The detective submitted the rape kit and the blood sample to the Bureau of Criminal Investigation ("BCI"), whose analysts performed DNA tests on the vaginal smears and appellant's blood. As the result of extracting the sperm portion from T.W.'s vaginal smears, analysts found two DNA profiles. One DNA profile reflected a major contributor to the sample, while another profile reflected a minor contributor to the sample. The DNA profile from the major contributor of the sperm taken from T.W.'s vaginal smears was consistent with the DNA profile derived from appellant's blood standard. Since the DNA profile showed that a minor contributor also existed, a blood sample from T.W.'s husband was obtained and tested. The profile of the minor contributor was consistent with T.W.'s husband.
T.W. did not know the whereabouts of her car for two months. Eventually, she received notice from an impound lot that the car would soon be destroyed. Detective Rogers took custody of the car. Inside the car, Detective Rogers found T.W.'s boots on the floor behind the passenger's seat; her belt on the floor in front of the passenger's seat; her purse; her jacket; and a piece of leather that appeared to have been torn from the jacket. Detective Rogers collected all of these items. Detective Rogers also collected a seat cover removed from the front passenger's seat that exhibited a stain. He submitted the seat cover to BCI, but BCI did not test the stain.
The state charged appellant with four crimes: rape; kidnapping to facilitate the commission of any felony; kidnapping for the purpose of terrorizing or inflicting physical harm on the victim; and theft of a motor vehicle. Although appellant requested discovery before trial, the state did not provide a copy of the videotape obtained from the bartender, and it never disclosed the existence of the seat cover to appellant.
Appellant was tried before a jury. Appellant learned Detective Rogers had collected the seat cover by cross-examining the detective at trial. The state had not disclosed the existence of the stained seat cover to appellant. On the second day of his trial, appellant learned that the state had not given him a copy of the videotape and moved for a mistrial. The trial court denied mistrial, and the state provided appellant with a copy of the tape on the morning of the third day of trial. After viewing the tape, appellant used it in his direct examination of T.W. and offered the tape into evidence as defendant's Exhibit A.
While testifying in his own defense, appellant acknowledged for the first time that he had sex with T.W. He claimed the sex was consensual sex that occurred in the second-floor bathroom of the house where T.W. had taken him. Appellant claimed that, after he had sex with T.W., he left the party and walked to several different places that night. Despite appellant's testimony, the jury convicted him of three of the four charges: rape, kidnapping for the purpose of terrorizing or inflicting physical harm, and theft of T.W.'s car. The jury acquitted him of the charge of kidnapping to facilitate the commission of a felony. After the trial court found appellant to be a sexual predator, the trial court sentenced him to serve five years for rape; nine years for kidnapping, to be served consecutively to the rape sentence; and seventeen months for theft, to be served concurrently to the rape and kidnapping sentences.
Appellant filed a motion for a new trial pursuant to Crim.R. 33, claiming that the videotape and the seat cover constituted newly discovered evidence. The trial court denied appellant's motion. Appellant now raises eight assignments of error for our review.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO GRANT HIM A NEW TRIAL.
In this assignment of error, appellant presents two issues. He first claims that the trial court erred when it did not order a new trial because the state violated discovery by failing to provide him with the videotape depicting activity in Cindy's Pub on the night of the crime. Appellant next alleges that the trial court erred when it did not order a new trial because the state violated discovery by failing to disclose that it had collected as evidence the passenger's side car seat cover on which the rape occurred.
The trial court denied appellant's motion for new trial, filed under Crim.R. 33(A)(6).[4] The motion for new trial alleged that the state failed to disclose the videotape before trial and by failing to either test or disclose the existence of the seat cover. In reviewing the trial court's determination regarding newly discovered evidence, we generally employ the abuse of discretion standard of review. State v. Johnston
(1988), 39 Ohio St.3d 48, 59. However, when a defendant asserts that the state withheld exculpatory evidence, the fact that such evidence was available to the prosecution and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. Id. at 60, quoting United States v. Kelly
(C.A.D.C. 1986), 790 F.2d 130, 135, citing United States v. Agurs
(1976), 427 U.S. 97, 111, 96 S.Ct. 2392.
Since the failure to disclose material exculpatory evidence violates a defendant's Fourteenth Amendment right to due process, an appellate court reviewing a trial court's resolution of a motion for a new trial claiming a violation of Brady v. Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, utilizes a due process analysis rather than an abuse of discretion analysis. Johnston, 39 Ohio St.3d at 59. We must therefore determine whether the prosecution has suppressed evidence that is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. See Johnston, 39 Ohio St.3d at 59, citing Brady,373 U.S. at 87, 83 S.Ct. at 1196-97.
In order to establish a Brady violation, three elements must be demonstrated: first, that the prosecution failed to disclose evidence upon request; second, that the evidence was favorable to the defense; and third, that the evidence was material. See Moore v. Illinois (1972),408 U.S. 786, 92 S.Ct. 2562. In United States v. Bagley (1985),473 U.S. 667, 105 S.Ct. 3375, the United States Supreme Court held that both exculpatory and impeachment evidence may be the subject of a Brady
violation, so long as the evidence is material.
Bagley also reformulated the materiality test to be applied where evidence has been suppressed. In determining whether the prosecution improperly suppressed evidence favorable to an accused, the court ruled that such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Bagley, 473 U.S. 667,105 S.Ct. 337. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id.; see, also, Pennsylvania v.Ritchie (1987), 480 U.S. 39, 57, 107 S.Ct. 989, 1001.
 A. Disclosure of the Videotape
Detective Rogers obtained the videotape depicting the events at the bar from Cindy Mayer, a bartender at Cindy's Pub, when he initially investigated the crimes early in January 1999. The videotape shows seven hours of events inside the pub on December 31, 1998, including appellant's several interactions with T.W. and T.W.'s actions leaving the bar with another man for approximately twenty minutes on each of two occasions.
Once Detective Rogers obtained the videotape, he used the tape to identify appellant, questioning both the bartender and T.W. T.W. identified appellant as the perpetrator of the crimes from his likeness on the videotape. At appellant's preliminary hearing, T.W. testified that she had viewed a videotape and identified appellant from the tape. Despite appellant's request for disclosure of all evidence in the state's possession that was favorable to defendant and all tangible items of evidence in the state's possession, the state did not provide appellant with a copy of the videotape in its discovery material.
During the state's case-in-chief on the second day of appellant's trial, Cindy Mayer testified that she had given the videotape to the police department. Appellant then moved for a mistrial on the ground that the state had never disclosed the tape to him in discovery. The court asked appellant's counsel if he was aware of the tape's existence, and counsel stated that he was aware of T.W.'s testimony at appellant's preliminary hearing that she had identified appellant from the videotape. At the beginning of the third day of trial, the state gave appellant a copy of the videotape, and the court denied his request for a mistrial.
The state contends that it was required to disclose only favorable, material evidence known to the prosecuting attorney. Since the prosecutor did not know of the tape's existence, did not review the tape or find anything exculpatory, and did not intend to use the tape at trial, the state contends it was not required to disclose the tape. First, the prosecutor's lack of awareness of the videotape's existence cannot excuse his failure to disclose the evidence. The police are part of the state and its prosecutorial machinery. State v. Johnson (1999),134 Ohio App.3d 586, 592. Therefore, Detective Rogers' knowledge of the videotape must be imputed to the prosecutor. See id.
Next, we note that appellant filed a request for discovery under both Crim.R. 16(B)(1)(c) and Crim.R. 16(B)(1)(f). Crim.R. 16(B)(1)(c) reads:
 (c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
Crim.R.16(B)(1)(f) reads:
 (f) Disclosure of evidence favorable to defendant. Upon motion of the defendant, before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known, to the prosecuting attorney, favorable to the defendant and material either to guilt or to punishment. * * *
Compliance with the discovery requirements of Crim.R. 16(B)(1)(f), the language of which is nearly identical to Brady's language, fulfills the state's due process obligations. State v. Keene (1998), 81 Ohio St.3d 646,650; State v. Hesson (1996), 110 Ohio App.3d 845, 851. Brady does not authorize extensive pre-trial discovery by the defendant. State v. Clay
(1972), 29 Ohio App.3d 206, 213; see, also, In re Jones (1998),132 Ohio App.3d 173, 175 (Rules of Criminal Procedure do not mandate "full," or "open file," discovery).
However, the words of Crim.R. 16(B)(1)(c) suggest that the rule requires broader disclosure than that mandated by due process. Crim.R. 16(B)(1)(c) does not track Brady's words, "favorable to the defendant and material either to guilt or punishment," as does Crim.R. 16(B)(1)(f). Instead, Crim.R. 16(B)(1)(c) requires the state to disclose documents and tangible objects that a prosecutor intends to use at trial or that are "material to the preparation of [the accused's] defense." Thus, Crim.R. 16(B)(1)(c) appears to hold the state to a standard that requires disclosure of more evidence.
We conclude that the videotape was evidence that the state was required to disclose under Crim.R. 16(B)(1)(c). The state contends that there is no Brady violation, however, because the state did not withhold the evidence, and there can therefore be no prejudice. The state argues that appellant knew or should have known about the tape before trial, and he introduced the tape and extensively examined T.W. about its contents during trial. We agree that appellant was aware of the videotape's existence before trial. In answer to the trial court's question, counsel specifically stated that he was aware of T.W.'s testimony at the preliminary hearing, in which she stated that she identified appellant, to police, from a videotape.
The tape's existence had therefore been disclosed to appellant, albeit through a witness instead of the prosecutor. With this knowledge, appellant could have acted to obtain the tape earlier by filing a specific discovery request. See Clay, 29 Ohio App.2d at 213 (prosecution has no burden to disclose exculpatory facts when the facts are readily available to a diligent defender). In addition, the record shows that the state did make the tape available to appellant on the third day of trial.
Moreover, appellant himself introduced the tape into evidence as defendant's Exhibit A after examining T.W. with the tape. There is some dispute whether evidence admitted at trial may constitute grounds for aBrady violation. See State v. Roughton (1999), 132 Ohio App.3d 268,302, n. 1. The dispute stems from appellate court interpretations ofState v. Wickline (1990), 50 Ohio St.3d 114, 116. Those appellate courts held Wickline created a bright-line rule that previously withheld exculpatory material discovered during trial may never form the basis for a Brady claim. See State v. Brown (1996), 112 Ohio App.3d 583, 595; see, also, State v. Green (2000), 90 Ohio St.3d 352, 372 (evidence presented during trial cannot constitute a Brady violation).
However, in State v. Aldridge (1997), 120 Ohio App.3d 122, 145-46, the Second District Court of Appeals interpreted Wickline to mean that Brady
only applies to material discovered after trial because the defendant, if he so chooses, may generally ensure that material discovered before or during trial will be entered into evidence, and he is not substantially prejudiced. Indeed, Crim.R. 16(E) provides the trial court with several measures to ensure that the failure to comply with discovery rules does not result in prejudice. Wickline, 50 Ohio St.3d at 116. Under Crim.R. 16(E), the trial court may exercise its discretion to permit inspection of the evidence, to grant a continuance, to prohibit introduction of the evidence, or to effect other measures that it deems just under the circumstances.
Here, the trial court ordered the state to provide appellant with a copy of the videotape, and appellant's counsel obtained that copy on the third morning of trial. However, counsel did not avail himself of additional remedies that the trial court could have ordered under Crim.R. 16(E).[5] Appellant's counsel did not request a continuance to view the tape or to prepare to question witnesses about it. While objecting to the untimely disclosure because he would have to view the tape overnight, counsel appears to have adequately done so. If any additional remedies were required, counsel should have made additional requests.
Indeed, counsel took measures to place T.W. on the stand during his own case-in-chief, examining her extensively through the use of the videotape. Once he had impeached T.W. on several points regarding her prior testimony, counsel offered the tape into evidence as defendant's Exhibit A. The trial court admitted the tape, and the jury considered it in rendering its verdict.
Given the circumstances surrounding the videotape's disclosure and admission, we cannot say that the state actually withheld the tape. Although appellant had knowledge of the videotape, the state disclosed the tape belatedly. Nonetheless, appellant's counsel received a copy of the videotape, and he had the opportunity to avail himself of remedies provided by Crim.R. 16(E). Moreover, counsel was able to both view and use the videotape in his extensive examination of T.W. at trial before introducing the tape into evidence of his own volition. Because there is no reasonable probability that a more timely disclosure of the videotape would have changed the outcome of the proceeding, no Brady violation occurred.
 B. Non-disclosure of the Seat Cover
Unlike the existence of the videotape, appellant was unaware of the existence of the cloth passenger's seat cover Detective Rogers removed from T.W.'s Sunbird. Although the car had disappeared after the crime, police recovered and searched the car when its location was discovered approximately two months later. From the car, Detective Rogers recovered T.W.'s boots, jacket, purse, belt, and a small piece of leather.
Detective Rogers also collected other items from the car that he professed to have considered "irrelevant." Among these "irrelevant" items was the passenger's side seat cover. From T.W.'s statement, Detective Rogers knew the rape had occurred there and that appellant had ejaculated. Detective Rogers saw that there was a stain on the seat cover, and he sent the seat cover to BCI with a request that BCI's forensic scientists analyze it. Until Detective Rogers testified on cross-examination during appellant's trial, appellant had no knowledge that this piece of evidence existed, that police had collected it, or that the detective had sent it to BCI with a request for forensic testing.
Again, the state seeks to excuse its non-disclosure of the seat cover by arguing that the prosecutor can only disclose evidence of which he is aware. We agree that it is questionable whether the prosecutor was made aware that the seat cover had been collected as evidence. However, Detective Rogers, who was in charge of the investigation and collection and submission of the evidence, was completely aware of its existence as shown by his trial testimony. Detective Rogers' knowledge of the seat cover must be imputed to the prosecutor. See Johnson,134 Ohio App.3d at 592, quoting State v. Wiles (1991), 59 Ohio St.3d 71, 78, certiorari denied (1992), 506 U.S. 832, 113 S.Ct. 99; see, also, State v. Sandlin
(1983), 11 Ohio App.3d 84, 89. Therefore, we conclude that the state withheld the evidence from appellant.
Appellant argues that the state's withholding impeded his defense because BCI failed to analyze the seat cover and his own DNA expert, which the trial court had already authorized, could have analyzed the stain. Neither the state nor its agencies are required to engage in affirmative action to gather evidence that the accused might feel necessary to his defense. City of Kettering v. Baker (1975),42 Ohio St.2d 351, 354; see, also, State v. Urrego (1974),41 Ohio App.2d 124, 125. Indeed, BCI's administrative "best evidence policy" requires it to test only the piece or pieces of evidence that constitute the most direct source of evidence or, in a rape case such as this one, the most direct link between the alleged rapist and the victim.[6]
Until his trial testimony, appellant claimed he had no sexual contact with T.W. BCI determined that DNA profiles from the semen portion of the vaginal swabs from the rape kit matched appellant's DNA and the DNA standard collected from T.W.'s husband. DNA from the vaginal swabs confirmed that appellant had sexual contact with T.W., thus constituting the "best evidence" of rape. Therefore, BCI was not required to take further measures to test the stain on the seat cover, even though appellant might have felt such tests were necessary to his defense. SeeUrrego, 41 Ohio App.2d at 125.
Although the state is not required to gather evidence for the defense, the state may not suppress evidence. Baker, 42 Ohio St.2d at 354;Urrego, 41 Ohio App.2d at 125. An accused has the right to be informed by the prosecutor of all potentially exculpatory evidence, and he has the right to examine properly preserved potentially exculpatory evidence before trial. Roughton, 132 Ohio App.3d at 302. We also note that Crim.R. 16(B)(1)(c) requires the state to disclose tangible evidence that is "material to the preparation of [appellant's] defense," which requires disclosure of more evidence than that required by Brady. We conclude that the state was compelled, by Crim.R. 16, to tell appellant about the existence of the seat cover and to allow appellant's DNA expert to examine the evidence. See Roughton, 132 Ohio App.3d at 302. The state withheld this evidence.
The question to be answered, then, is whether the evidence the state withheld was "material" such that the outcome of the proceeding is unreliable. Materiality is the key issue where exculpatory evidence is alleged to have been withheld. Johnston, 39 Ohio St.3d at 60. The standard is whether there is a reasonable probability — not the mere possibility — that, had the seat cover been disclosed to the defense the result of the proceedings would have been different. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. United Statesv. Agurs (1976), 427 U.S. 97, 109-110, 96 S.Ct. 2392; State v. Jackson
(1991), 57 Ohio St.3d 29, 33.
Here, appellant claims that the stained seat cover was critical to his case because he claimed he had consensual sex with T.W. in a bathroom. Had the seat cover been tested, and the tests concluded that the stain was not semen, appellant claims he could have bolstered his own claims about the location of the sex while impeaching T.W.'s claim that he raped her in the car, thus exculpating him. The state's non-disclosure of the seat cover presents a very close call for this court on the "materiality" prong of the Brady analysis.
In State v. Roughton (1999), 132 Ohio App.3d 268, a case very similar to this one, Roughton made similar claims regarding undisclosed DNA evidence. In that case, the state collected a bed sheet from the victim's bed on which an oral rape had occurred. BCI performed tests on the sheet for the presence of semen and obtained nucleated cells, from which DNA might be obtained, and placed those cells onto a glass slide.Roughton, 132 Ohio App.3d at 297. BCI did not, however, test for DNA from the cells on the glass slides. Id. The state had neither disclosed the existence of the DNA on the glass slide that had been submitted to, but not analyzed by, BCI, nor did it allow Roughton's expert to examine the DNA evidence. Id. at 299.
The court held that the state was obligated by Crim.R. 16 to disclose the slides containing the DNA to Roughton for his expert's examination.Roughton at 299. The court then went on to engage in the Brady
analysis. In determining whether the evidence was material, the court determined that the existence or nonexistence of nucleated DNA cells alone was critical to Roughton's case. Roughton at 302. If the DNA contained on the slide had excluded Roughton as the source, he would have been exonerated of the crime. Thus, the DNA evidence was potentially exculpatory. The court found the nucleated DNA cells were material such that suppression of this evidence undermined confidence in the outcome of the trial. Id. at 302-03.
The present case, however, is factually distinguishable from Roughton. First, unlike the nucleated DNA cells that the state had failed to disclose in Roughton, we simply do not know whether the substance of the stain is, in fact, semen; whether DNA could be extracted from the semen; or whether any extracted DNA would have matched appellant's DNA. Moreover, appellant did not request a continuance in order to view or test the seat cover once the state disclosed its existence. Indeed, even if appellant's own expert or BCI had tested the seat cover, the resulting DNA analysis might have inculpated appellant instead of exculpating him.
In addition, admissibility of the evidence at issue is critical to a successful Brady claim because evidence must be admissible to be able to alter the outcome of a proceeding. State v. Aldridge (1997),120 Ohio App.3d 122, 148, quoting State v. Today's Bookstore, Inc. (1993), 86 Ohio App.3d 810, 821. Given the authentication and chain of custody issues inherent in the car's two-month disappearance, we question whether test results obtained from the stain on the seat cover would have been admissible at trial.
Even assuming the evidence was favorable to appellant and would have been admissible, it was not potentially exculpatory as was the evidence in Roughton. Roughton claimed that he was not the person who committed the rape. Appellant, however, claimed at trial that he had consensual sex with T.W. in a location other than the car. Indeed, DNA evidence taken from a vaginal swab confirmed that appellant had sex with T.W. Given the other DNA evidence admitted here, the results of DNA obtained from the seat cover, if favorable to appellant's theory, would not have necessarily exonerated him.
We find that the seat cover withheld by the state was not material so as to deny appellant due process under Brady. In our opinion, it would be pure speculation to grant a new trial based upon the mere possibility that the seat cover's stain may or may not be semen, that DNA could be extracted if the stain is semen, and that the DNA contained in the semen might not match appellant. We can only speculate as to whether its non-disclosure undermined the reliability of the outcome of the proceedings. Even assuming that test results would have been admitted into evidence, the results would not have necessarily exculpated appellant of the crime.
Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT PERMITTED THE STATE TO CALL A REBUTTAL WITNESS THAT THE STATE HAD NOT LISTED IN ITS DISCOVERY RESPONSE.
Appellant claims that the trial court erred when it allowed the state to call Rachel Carter as a rebuttal witness because she was neither listed as a witness in any of the state's discovery responses, nor did her testimony rebut any evidence he presented. The state acknowledges that it did not list Rachel Carter as a witness in its discovery responses, but argues that it could not foresee its need to call Carter until appellant himself testified about the location in which he allegedly had sex with T.W. Moreover, the state argues, Carter's testimony directly rebutted appellant's version of the incident.
The standard for determining whether the state should have provided the name of a witness called for rebuttal is whether the state "reasonably should have anticipated that it was likely to call the witness," either in its case-in-chief or in rebuttal. State v. Lorraine (1993),66 Ohio St.3d 414, 423, rehearing denied, 67 Ohio St.3d 1421, certiorari denied (1994), 510 U.S. 1054, 114 S.Ct. 715; State v. Howard (1978),56 Ohio St.2d 328, 333. Under Crim.R. 16, the state is not required to disclose the names of witnesses whose testimony becomes relevant for impeachment purposes only after presentation of the defense case. Id., at 328, paragraph two of the syllabus. We review the trial court's admission of rebuttal testimony for abuse of discretion. State v.Finnerty (1989), 45 Ohio St.3d 104, 107.
Here, appellant initially gave police a statement in which he stated that he did not have sex, consensual or otherwise, with T.W. In his testimony, appellant acknowledged for the first time that he had sex with T.W., but claimed that he did not have sex with her in the car. Instead, appellant stated during his testimony that he had sex with T.W. in a second-floor bathroom at a home to which T.W. had taken him for a party. Although appellant did not know whether the home was Jennifer Lakes' home, he stated that T.W. had asked two men where "Rachel" was when they entered the home.
On rebuttal, the prosecutor placed Rachel Carter on the stand. Although appellant objected to Carter's testimony, the trial court allowed the testimony after finding that the prosecutor could not have reasonably foreseen appellant would testify that he had sex with T.W. at a party. Carter testified that she had been at Jennifer Lakes' home on that evening and that appellant had never entered the home with T.W. Carter also testified that Lakes' home did not have a second-floor bathroom.
The trial court did not abuse its discretion when it permitted Carter to testify on rebuttal. The prosecution could not have reasonably foreseen its need to call Carter as a witness so that the state was bound to disclose her identity in discovery. Appellant had never claimed he had sex with T.W. until he testified at trial that he had sex with T.W. in a second-floor bathroom. Instead, appellant had claimed he did not have sex with T.W. at all, and the state's case focused on showing that appellant was the person who raped T.W. Until trial, the state would have had no reason to suspect that it would need to present Carter's testimony to rebut appellant's new claim.
Moreover, Carter's testimony most assuredly rebutted appellant's trial testimony. To "rebut" is to refute, oppose, or counteract something by evidence, argument, or contrary proof. Black's Law Dictionary (7 Ed.Rev. 1999) 1274. Carter's testimony that appellant and T.W. never entered the home and that the home does not have a second-floor bathroom directly contradicts appellant's testimony that he and T.W. entered the home and had sex in the second-floor bathroom. Since Carter's testimony rebutted appellant's testimony, the trial court correctly allowed it even though Carter's name had not been disclosed. Appellant's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION TO SUPPRESS.
Appellant claims the trial court erred when it refused to suppress a written statement memorializing oral statements he gave police on February 6, 1999, because his refusal to sign the written statement indicates its factual inaccuracy, thus making it involuntary. The state responds that the totality of the circumstances, including appellant's signed rights waiver, indicate that he made the statements knowingly, voluntarily, and intelligently, despite his refusal to sign the written statement.
In order for a waiver of the rights required by Miranda v. Arizona
(1966), 384 U.S. 436, 86 S.Ct. 1602, to be valid, the state bears the burden of demonstrating a knowing, intelligent, and voluntary waiver based upon the totality of the facts and circumstances surrounding the interrogation. Moran v. Burbine (1986), 475 U.S. 412, 106 S.Ct. 1135. An express written or oral statement waiving Miranda rights may be strong proof of the validity of the waiver. North Carolina v. Butler (1979),441 U.S. 369, 373, 99 S.Ct. 1755, 1757. Nevertheless, the trial court must consider a number of factors in determining whether the accused made a voluntary statement, including: the defendant's age and mentality; the defendant's prior criminal experience; the length, intensity, and frequency of the interview; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. See State v.Brewer (1990), 48 Ohio St.3d 50, 58.
An appellate court may not disturb a trial court's decision on a motion to suppress where it is supported by competent, credible evidence. Statev. Retherford (1994), 93 Ohio App.3d 586, 592. When considering a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of witnesses and the weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19, 20. Relying on the trial court's factual findings, the appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." State v. Anderson (1995), 100 Ohio App.3d 688,691.
Appellant claims that his refusal to sign the written statement indicated some factual discrepancy that impacted its voluntariness. The fact that a statement has been written by someone other than the accused, and the accused has refused to sign it, does not automatically render the statement involuntary. Alleged factual discrepancies between an oral statement and a statement written by another person that purports to memorialize the oral statement impacts the written statement's credibility. The trial court may take such allegations into account when making credibility assessments that impact its ultimate determination about the statement's voluntary character. Once the trial court finds that the statement is voluntary, however, the written statement's credibility becomes a question to be resolved by the jury.
Here, the trial court held a pre-trial hearing in which Detective Thomas, Detective Howard, and Detective Rogers testified about the circumstances surrounding the questioning of appellant and the oral and written statements. Detective Howard testified that he read aloud aMiranda card to appellant. Appellant read the signature card by himself as Detective Howard read it aloud. Appellant then signed and dated theMiranda card. Appellant told the detectives that he understood his rights, and he would speak to them about the rape.
The interview lasted approximately fifty minutes. Appellant neither asked for an attorney during the interview, nor did he refuse to answer the detectives' questions. Instead, appellant was very cooperative. During the interview, Detective Rogers took hand-written notes as to appellant's statements, which he asked appellant to clarify. At the conclusion of the interview, Detective Rogers transposed appellant's oral statements into a written statement, the contents of which he took from his notes after asking appellant to clarify statements on several occasions. The detective then asked appellant to read over the written statement and sign it.
Appellant read the detective's written statement, but he refused to sign it and did not give an explanation. Appellant testified at the hearing that he did not sign the written statement because it did not accurately reflect his oral statements, stating that he told the detective it was not correct. The trial court heard appellant's testimony, but concluded that appellant's statement to police was voluntary. Since the trial court acts as the primary judge of credibility, the court could assess appellant's claims that the written statement was not factually accurate in light of the other evidence of voluntariness presented.
Reviewing the totality of the circumstances, we find that the trial court properly assessed the statement's credibility and determined that appellant's refusal to sign the written statement did not render the statement involuntary. Since the trial court's finding that appellant's statements were voluntary is supported by competent, credible evidence, its ruling denying his motion to suppress is affirmed. Appellant's third assignment of error is overruled.
Assignment of Error No. 4:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO FULLY AND COMPLETELY ANSWER A QUESTION FROM THE JURY.
In this assignment of error, appellant contends that the trial court erred when, in answer to the jury's query, it did not explain the difference between two counts of kidnapping with which the state had charged appellant. The state responds that the trial court's answer to the jury to re-read all of the instructions was a sufficient and appropriate response that did not constitute an abuse of discretion.
Initially, we note that appellant's counsel did not object to the trial court's response to the jury's question. An appellate court will not consider an alleged error that the complaining party did not bring to the trial court's attention at the time the alleged error is said to have occurred. State v. Slagle (1992), 65 Ohio St.3d 597. Here, appellant did not object when the court, in his presence, informed him of the jury's question and proposed to answer the question by referring the jury to the instructions on the two kidnapping counts. Because he did not object, appellant cannot assign as error the trial court's failure to give further definitions or instructions to the jury. Crim.R. 30(A).
However, plain errors or defects affecting substantial rights may be noticed on appeal although they were not brought to the attention of the court. Crim.R. 52(B). Error does not rise to the level of plain error unless, but for the alleged error, the outcome of the trial clearly would have been otherwise. State v. Wickline (1990), 50 Ohio St.3d 114, 120. Thus, we must determine whether the trial court's response to the jury's question was error and whether the outcome of appellant's trial would have been different absent that error.
When a jury requests further instruction, or clarification of instructions previously given, a trial court may exercise its discretion in determining the appropriate response. State v. Carter (1995),72 Ohio St.3d 545. A trial court response directing the jury to the jury to reread written instructions that clearly and comprehensively answer the question, instead of giving further oral instructions, is appropriate and within the scope of the court's discretion. See State v. Lindsey
(2000), 87 Ohio St.3d 479, 488.
During deliberations, the jury sent the trial court a note asking the court to explain the difference between the two kidnapping charges. The court proposed to answer the question by telling the jury to carefully reread the instructions on the two counts, where it would find the law necessary to reach its verdict. Indeed, the jury apparently resolved its question, convicting appellant of one count of kidnapping and acquitting him of the other count. Accordingly, the trial court's decision to refer the jury to the instructions, rather than give further oral instruction, was appropriate and within the scope of its discretion. See Lindsey,87 Ohio St.3d at 488. Appellant has not shown that the court committed error that would have changed the outcome of his trial. Appellant's fourth assignment of error is overruled.
Assignment of Error No. 5:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT FOUND HIM TO BE A SEXUAL PREDATOR.
Appellant next contends that the trial court erred in finding him to be a sexual predator when there existed no clear and convincing evidence to support that finding. The state responds that, despite a lack of evidence from the forensic center, appellant's extreme cruelty to the victim was sufficient for the trial court to find that appellant was likely to engage in future sexually oriented offenses, thus justifying his status as a sexual predator.
The trial court found that appellant was a "sexual predator." A sexual predator is statutorily defined as a person who has been convicted of or pled guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses. R.C.2950.01(E). R.C. 2950.09(B)(2)(a) through (j) list the factors a trial court must consider in determining whether a person is a sexual predator. Among those factors are the factors the trial court used here: appellant's extensive criminal record and the threats of cruelty appellant used in perpetrating the crime. R.C. 2950.09(B)(2)(b); R.C.2950.09(B)(2)(i). The statute does not require that each factor be met in order for the trial court to find that a defendant is a sexual predator.
A trial court must find that a defendant is a sexual predator by clear and convincing evidence. R.C. 2950.09(B)(3). Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. We will find clear and convincing evidence, as a matter of law, where the record does not demonstrate that there is a sufficient conflict in the evidence presented. Id., at 479.
Initially, appellant implies that the trial court did not have sufficient information to make its sexual predator determination without the probation department's post-judgment interview. However, the record shows that appellant refused to submit to the interview of his own volition. Having refused to give additional information for the trial court's consideration, appellant cannot now decry the lack of evidence upon which the trial court based its sexual predator determination.
Appellant seeks to invalidate the trial court's use of his prior criminal record as a factor in its sexual predator determination because his criminal past did not include any sexual offenses. R.C.2950.09(B)(2)(b) states that, in determining sexual predator status, the trial court must consider "the offender's prior criminal record regarding all offenses, including, but not limited to, all sexual offenses." Thus, the trial court properly weighed all of appellant's prior offenses, even those not included within the definition of a sexually oriented offense in R.C. 2950.01(D), in finding him a sexual predator. See State v. Randall (Jan. 19, 2001), 2001 WL 46232, *4, n. 3, Lake App. No. 99-L-040.
The trial court also considered a second factor in finding appellant a sexual predator. Under R.C. 2950.09(B)(2)(i), the trial court was required to consider "[w]hether the offender, during the commission of the sexually oriented offense for which sentence is to be imposed, displayed cruelty or made one or more threats of cruelty." The trial court here noted that appellant displayed cruelty to T.W., in the form of his threats to take her to the river, causing her to fear that appellant would kill her. The record supports this finding.
Given the evidence in the record of these relevant and valid considerations, we find that the court had before it sufficient evidence from which to determine by clear and convincing evidence that appellant is likely to commit sexually oriented crimes in the future. We find no conflict in the evidence presented to the trial court on the issue of appellant's status as a sexual predator. Since the trial court's determination that appellant is a sexual predator is supported by clear and convincing evidence on both factors, appellant's fifth assignment of error is overruled.
Assignment of Error No. 6:
 THE DEFENDANT'S CONVICTION FOR RAPE AND KIDNAPPING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant contends that the evidence weighed so heavily against his convictions for rape, kidnapping, and theft that reversal is warranted. The state responds that the evidence it presented was credible enough to support the jury's verdicts for all of the offenses.
In determining whether a criminal conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. When engaging in a manifest weight analysis, the reviewing court must keep in mind that the trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. Statev. Gibbs (1999), 134 Ohio App.3d 247, 256. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Thompkins,78 Ohio St.3d at 387.
Here, the evidence weighs heavily toward appellant's conviction. Appellant contends that no physical evidence supports the verdicts, and he attacks T.W.'s credibility by noting numerous inconsistencies in her testimony. However, a substantial amount of direct and circumstantial evidence renders T.W.'s testimony believable and supports her version of the events. Not only was T.W. able to specifically identify appellant as her attacker, but T.W.'s location and her physical condition immediately after the crime, as well as the clothing recovered from her car, supports the conclusion that the rape occurred there.
No evidence, but for appellant's own testimony, supported his claim that he had consensual sex with T.W. in the second-floor bathroom at the party. Appellant's own testimony was even contradicted by evidence that neither appellant nor T.W. had been at the party and no such bathroom existed. Given the substantial evidence supporting T.W.'s testimony and the lack of evidence supporting appellant's claims, the jury rationally chose to believe T.W.'s testimony over that of appellant.
After a full review of the record, we cannot find the jury's determination to place greater weight on T.W.'s testimony than on appellant's testimony unwarranted. The jury reasonably determined that appellant was guilty of the crimes beyond a reasonable doubt. Appellant's sixth assignment of error is overruled.
Assignment of Error No. 7:
 DEFENDANT-APPELLANT RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL.
Appellant contends that his attorney acted below reasonable professional norms, resulting in prejudice to him, when counsel did not request a continuance after the state provided him with the videotape of the bar on the night of the crimes; when counsel failed to object to the trial court's response to the jury question regarding the difference between the two kidnapping charges; and when counsel failed to request a continuance of the sexual predator hearing. The state responds that none of counsel's actions amount to ineffective assistance.
When reviewing appellant's claim of ineffective assistance of counsel, this court engages in the two-pronged test enumerated in Strickland v.Washington (1984), 466 U.S. 668, 690-91, 104 S.Ct. 2052, 2066, and approved by the Ohio Supreme Court in State v. Bradley (1989),42 Ohio St.3d 136, syllabus, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258. This court determines: (1) whether counsel's performance fell below an objective standard of reasonable professional competence, and (2) if so, whether there is a reasonable probability that counsel's unprofessional errors prejudiced appellant so as to deprive him of a fair trial. Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066.
To show error in counsel's actions, appellant must overcome the strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy and falls within the wide range of reasonable professional assistance.Strickland, 466 U.S. at 690-91; 104 S.Ct. at 2066. Since judicial scrutiny of counsel's performance is highly deferential, reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. Id.
To show resulting prejudice, appellant must establish a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different. Strickland,466 U.S. at 690-91; 104 S.Ct. at 2066. Courts may engage in the prejudice prong of the analysis alone. State v. Loza (1994), 71 Ohio St.3d 61, 83.
 A. Counsel's Failure to Request a Continuance to View the Videotape
Appellant contends that his attorney's failure to request a continuance to view the videotape that was disclosed to him on the third day of trial constituted the ineffective assistance of counsel. Appellant is correct that his attorney did not request a continuance to study the tape. However, we cannot find that appellant was prejudiced by his attorney's failure to request additional time.
The decision of trial counsel not to pursue every possible trial tactic for reasons of strategy does not result in ineffective assistance of counsel. State v. Brown (1988), 38 Ohio St.3d 305, 319, certiorari denied (1989), 489 U.S. 1040. Here, it appears that counsel did not require additional time to view the videotape. Indeed, counsel viewed the videotape overnight then used the tape when he called T.W. to the stand during his own case-in-chief. Not only did counsel use the videotape to extensively question T.W., impeaching her testimony as to several particulars, but he also placed the videotape into evidence. We cannot second-guess counsel's trial strategy. We can only conclude that he had reasons for presenting the defense in this manner.
Because counsel viewed the videotape and extensively questioned T.W.'s testimony by using the videotape, appellant could not have been prejudiced by his attorney's failure to request additional time. Nothing could have been gained by the continuance. There is no reasonable probability that the result of the proceedings would have been different had counsel requested additional time to study the videotape.
 B. Counsel's Failure to Object to the Trial Court's Answer to Jury's Question
Appellant next claims that counsel's failure to object to the trial court's answer to the jury's question about the difference between the two kidnapping charges prejudiced him because counsel failed to preserve the error for this court's review, thus resulting in our use of a plain error analysis for the court's response.
In response to appellant's fourth assignment of error, this court found that the trial court committed no error in responding to the jury's question. Appellant was not obligated to object to the trial court's proper actions. Even had counsel objected to the trial court's response, we would have found that the trial court committed no error that required reversal. Accordingly, counsel's failure to object did not constitute deficient performance, and the result of the proceedings would be no different had he objected.
 C. Counsel's Failure to Present Evidence at Appellant's Sexual Predator Hearing
Appellant next contends that counsel was ineffective for failing to present his own testimony at his sexual predator hearing or to move to continue the hearing so that he could be evaluated by the probation department a second time. Appellant has failed to show that counsel's actions resulted in prejudice that would have changed the outcome of that hearing.
As we have previously noted, the trial court considered all of the factors in R.C. 2950.09(B), and it determined that two factors warranted sexual predator status: appellant's criminal history and his cruelty to T.W. while committing the crime. Appellant has failed to show whether his own testimony, or any additional evidence elicited from him by the probation department, would have changed the trial court's sexual predator finding given the evidence the court had before it. Counsel's failure to continue the hearing to obtain an additional report or place appellant on the stand would not have changed the outcome; the trial court would still have found that appellant was a sexual predator.
Since appellant has failed to meet both prongs of the Strickland
analysis on any of the three allegations of ineffective assistance of counsel, his seventh assignment of error is overruled.
Assignment of Error No. 8:
 THE CUMULATIVE ERROR IN THIS CASE DEPRIVED DEFENDANT-APPELLANT OF A FAIR TRIAL.
 Appellant claims that, even if no individual error compels reversal, the cumulative effect of the errors denied him a fair trial. The state responds that, since there is no error, there can be no cumulative error.
Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. Fears,86 Ohio St.3d at 348; State v. DeMarco (1987), 31 Ohio St.3d 191,196-197. However, the doctrine of cumulative error is not applicable where the appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995),74 Ohio St.3d 49, 64.
Here, we have not found multiple instances of harmless error. Thus, there can be no cumulative effect, and the doctrine does not apply. Since the trial court did not err, appellant received a fair trial. Appellant's eighth assignment of error is overruled.
 ___________________ VALEN, J.
POWELL, P.J., and WALSH, J., concur.
[1] R.C. 2907.02(A)(2).
[2] R.C. 2905.01(A)(3).
[3] R.C. 2913.02(A)(1).
[4] Crim.R. 33(A) provides in pertinent part:
 Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
* * *
 (6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial.
[5] Crim.R. 16(E) reads:
Regulation of Discovery.
* * *
 (3) Failure to Comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.
[6] When evidence is submitted to BCI from law enforcement agencies, the agent in charge of the submission (here, Detective Rogers) explains the basics of the case to BCI so that BCI can determine what evidence to test.